IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM MEADOWS AND JEANIE MEADOWS, | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | CASE NO. 1:05-cv-1091-MEF |
| vs. | * | |
| | * | |
| THE MEGA LIFE AND HEALTH INSURANCE COMPANY, AND ITS AGENT, MICHAEL JOSHUA MILFORD, ET AL., | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Defendants. | * | |

## DEFENDANTS' SUPPLEMENTAL BRIEF OPPOSING REMAND

COME NOW, Defendants, by and through their undersigned counsel, and submit this supplemental brief in opposition to the Plaintiffs' Motion for Remand and Costs, and in support hereof say as follows:

On January 17, 2006, this Court granted Defendants' motion for limited remand discovery, allowing (i) the parties until March 3, 2006 to conduct remand-related discovery, (ii) Defendants through March 17, 2006 to file a supplemental brief and any evidentiary materials concerning remand, and (iii) Plaintiffs through March 31, 2006 to file a response. On February 17, 2006, the remand depositions of the Plaintiffs were conducted.

Focusing on the diversity of citizenship requirement for federal jurisdiction,[1] for the reasons outlined in the Notice of Removal, the initial brief of Defendant The MEGA Life and Health Insurance Company ("MEGA") in opposition to remand, and herein, Plaintiffs' motion for remand and costs should be denied.

---

[1]     Plaintiffs do not dispute that the amount in controversy requirement is satisfied.

First of all, Plaintiffs assert that MEGA's Notice of Removal is defective because Defendant Michael Joshua Milford ("Milford"), did not join in the Notice of Removal. That argument must fail. As explained by MEGA in its removal papers and initial brief opposing remand, at the time of removal, Milford was not served with the summons and complaint. Moreover, MEGA asserts that Milford was fraudulently joined to this lawsuit. Defendants reallege and refer this Court to the arguments, facts and applicable law in MEGA's Notice of Removal and initial brief opposing remand showing that, since Milford undisputedly had not yet been served at the time of filing of the Notice of Removal, he was not required to join in or consent to the Notice of Removal. In addition, the "unanimity rule," which requires all served defendants to consent to removal, is subject to the exception that unless and until the case is remanded, it is not necessary that a fraudulently or improperly joined defendant join with the other defendants in a petition for removal. Thus, MEGA's Notice of Removal is not defective because Milford did not join in the removal.

Next, this case was properly removed because Milford was fraudulently joined as a defendant. MEGA has shown, cause-of-action by cause-of-action, that there is no possibility that Plaintiffs would be able to establish any of their claims against Milford in state court. Furthermore, MEGA has provided supporting documentation for that position (see the exhibits to its Notice of Removal and its initial brief opposing remand), and this supplemental brief offers additional argument, facts and evidentiary support for the denial of the motion to remand.

## STATEMENT OF FACTS

### WILLIAM MEADOWS

Mr. Meadows is a 56-year-old man, who can read and write fair. (*Deposition of William Meadows at 21-22, excerpts attached as Exhibit A*). Mr. Meadows cannot recall exactly how he

learned about MEGA, but believes he saw an advertisement or received some brochures. (*Exhibit A at 27*). MEGA was then contacted. (*Exhibit A at 28*). On March 12, 2002, Michael Milford (an independent contractor for MEGA), visited the Meadows' home and conducted a sales presentation. (*Exhibit A at 28*).

Mr. Meadows testified that he and his wife advised Milford of prior medical conditions, that being high blood pressure for him and a bladder problem for her, which was noted on the application. (*Exhibit A at 33, 35-36 & Exhibit 3 to the deposition (March 12, 2002 application)*). Mr. Meadows admitted that in the MEGA brochure presented to him during the sales presentation, he could read and understand that a "pre-existing condition means a medical condition, sickness, or injury, not excluded by name or specific description." (*Exhibit A at 49-50 & Exhibit 1 to the deposition – page 10 of the Alabama Health Choice Benefit Plan brochure*). Mr. Meadows testified that he understood from Milford that MEGA would not cover any claims related to his heart, and that his wife would not be covered for any claims related to her bladder for a period of two years. (*Exhibit A at 36-37; Complaint at ¶ 7*). Mr. Meadows agreed to purchase the insurance certificate from MEGA and signed the application that day. (*Exhibit A at 35 & Exhibit 3 to the deposition (March 12, 2002 application)*).

Mr. Meadows produced documents during his deposition, one of which was the insurance certificate (attached to his deposition as Exhibit 3). (*Exhibit A at 52-53*). Mr. Meadows was unsure whether the insurance certificate was left with them that day or whether they received it at a later date. (*Exhibit A at 42*). Mr. Meadows read at least part of the insurance certificate that was received from MEGA in May of 2002, and in fact relied on a certain provision on page 8 of that certificate for his belief that he would have coverage for his heart condition and his wife would have coverage for her bladder condition after two years from when the coverage was

3

issued.  (*Exhibit A at 41, 101*).

Mr. Meadows testified that he read and understood the portion of the insurance certificate that if he was not satisfied that the coverage met his insurance needs, he could return the certificate to MEGA within 10 days upon receipt, and that upon receipt of the certificate by MEGA, MEGA would cancel the coverage as of the certificate date, refund all premiums paid, and treat the certificate as if it had never been issued.  (*Exhibit A at 53-54 & Exhibit 3 to the deposition (Certificate of Insurance)*).

Mr. Meadows agreed that page 8 of the insurance certificate contains the following definition:

> **Pre-Existing Condition** means a medical condition, Sickness or Injury <u>not excluded by name or specific description</u> for which:
>
> 1.    Medical advice, Consultation, or treatment was recommended by or received from a Physician within the two year period before the Effective Date of Coverage; or
>
> 2.    Symptoms existed which would cause an ordinarily prudent person to seek diagnosis, care or treatment within the two year period before the Effective Date of Coverage.

(*Exhibit A at 54-55 & p. 8 of Exhibit 3 (Certificate of Insurance)(underlined emphasis added)*).

Mr. Meadows also agreed that the exclusionary endorsement issued with the insurance certificate contains the following language:

> THERE IS NO COVERAGE OR BENEFITS PROVIDED FOR LOSSES DUE TO ANY DISEASE AND/OR DISORDER OF THE HEART AND/OR CIRCULATORY SYSTEM ON WILLIAM V MEADOWS.
>
> THERE IS NO COVERAGE OR BENEFITS PROVIDED FOR LOSSES DUE TO ANY DISORDER AND/OR DISEASES OF THE URINARY SYSTEM ON JEANIE L MEADOWS.

4

(*Exhibit A at 62-63 & Exhibit 3 to the deposition (Certificate of Insurance)*).  Mr. Meadows admitted that there was nothing in the language of the exclusionary endorsement that reflected anything about non-coverage for only two years.  (*Exhibit A at 64*).  He also admitted that he understood an endorsement was like something related to car insurance that excludes something from coverage.  (*Exhibit A at 101*).

When asked whether he agreed that the insurance certificate reflects that if the excluded medical condition is identified by name or specific description, it is not considered a pre-existing condition, Mr. Meadows stated that that was not the way he understood it, even though the language does reflect that fact.  (*Exhibit A at 65, 75-76*).  He admitted that with respect to the exclusionary endorsement issued with the coverage, diseases and disorders of his heart and circulatory system are excluded specifically by name. (*Exhibit A at 65*). Mr. Meadows understood that there was no coverage for his heart or circulatory system  (*Exhibit A at 67*), but testified that he assumed that his excluded condition would be covered after two years.  (*Exhibit A at 77*).  He took the language on page 8 of the insurance certificate for the definition of a pre-existing condition to mean that he nevertheless would be covered for his heart and circulatory system, but admitted that is not what the exclusionary endorsement indicates, and that the endorsement in fact excludes his heart and circulatory system from coverage.  (*Exhibit A at 68*). Mr. Meadows stated that he assumed, reading those two provisions together, that he was not covered for two years.  (*Exhibit A at 69*).  Mr. Meadows also stated that if he had read the language of that endorsement in 2002, it would have reflected the same thing then that it reflects today.  (*Exhibit A at 68*).  Mr. Meadows further admitted that he has had that document in his possession since May of 2002.  (*Exhibit A at 68*).

Mr. Meadows received a May 9, 2002 letter from MEGA and has had the certificate of insurance with the exclusionary endorsement and the May 9, 2002 letter in his possession since 2002. (*Exhibit A, Complaint at ¶¶ 9-10; Exhibit A at 80, 101 & Exhibit 4 to the deposition (May 9 letter)*). Mr. Meadows admitted that he read the May 9 letter, which provided the certificate of insurance, enrollment application, and in bold, informed that it was necessary for MEGA to attach an exclusionary endorsement to the coverage of insurance, and that depending on the conditions, the exclusions may be reconsidered in one year. (*Exhibit A at 71-72*). He further admitted that the letter reflects that MEGA would need a written request for consideration of removal of the excluded medical conditions, along with such medical evidence as may be available at the time that related to those conditions. (*Exhibit A at 72-73*). Mr. Meadows also admitted that the letter indicates that to request the reasons for MEGA's decision, Mr. Meadows should send a written request to MEGA within ninety (90) days of the date of the letter. (*Exhibit A at 73*). Mr. Meadows understood that the letter meant an exclusionary endorsement has been attached to the coverage when issued (*Exhibit A at 73*), and that there was no coverage for his heart and circulatory condition and no coverage for his wife's urinary condition. (*Exhibit A at 73-74*).

Mr. Meadows admitted that he did not, within one year of the May 9, 2002 letter, request reconsideration of the endorsement that specifically excluded any coverage for his heart or circulatory system. (*Exhibit A at 74-75*). Mr. Meadows instead went by the provision on page 8 of the insurance certificate relating to the definition of a pre-existing condition, for his understanding that coverage for his condition would nevertheless be afforded after two years. (*Exhibit A at 75, 77-78, 80-81, 102*). Mr. Meadows, however, admitted that the May 9, 2002

letter does not reflect anything about the exclusions for his and his wife's medical conditions being lifted in two years.  (*Exhibit A at 80*).

Mr. Meadows admitted that he could not recall specifically what Milford told him about coverage for his medical condition after two years, but that he could read, and he relied on that certain provision on page 8 of the insurance certificate for the definition of a pre-existing condition, for his belief that after two years, his medical condition would be covered.  (*Exhibit A at 83, 85*).  When asked if there were any specific statements that Milford made in that regard on March 12, 2002, Mr. Meadows could not testify to any such statements.  (*Exhibit A at 83-84*). Mr. Meadows admitted that he was probably not paying as much attention then as he was during his deposition and that he was probably only half-listening during the sales presentation. (*Exhibit A at 84*).

Mr. Meadows admittedly read and understood the language above his signature on the insurance application that "the agent does not have the authority on behalf of the Company to accept the risks, or to make, alter or amend the coverage or to extend the time for making any payment due on such coverage."  *(Exhibit A at 38-39 & Exhibit 3 to the deposition (March 12, 2002 application))*.  Specifically, in focusing on that language under the "Declarations and Agreements" section of his application, Mr. Meadows admitted that he knew the insurance agent could not write a rider or a waiver or issue the coverage and that the company would have to do that.  (*Exhibit A at 88-89 & Exhibit 3 to the deposition (March 12, 2002 application))*. Mr. Meadows was aware that the application would have to be submitted to MEGA, and that the company would make a decision as to whether to provide the coverage.  (*Exhibit A at 39*).

**JEANIE MEADOWS**

Jeanie Meadows is a 51-year-old woman who can read and write. (*Deposition of Jeanie Meadows at 7, excerpts attached as Exhibit B*). Mrs. Meadows testified that she had seen MEGA advertised on television and some brochures or something like that, and called MEGA to further inquire. (*Exhibit B at 11-12*). Mrs. Meadows testified that when she called MEGA, she talked with Milford, who said that he would be interested in visiting the Meadows to talk further about MEGA's insurance. (*Exhibit B at 12-13*). During that meeting, Mrs. Meadows was shown MEGA's Alabama Health Choice Benefit Plan brochure, which had been identified during her husband's deposition. (*Exhibit B at 17*). She testified that Milford asked if they had any health problems, and she informed him about her husband's heart problem and her urinary problem. (*Exhibit B at 18*).

Mrs. Meadows was shown page 10 of the Health Choice Benefit Plan brochure *(see Exhibit 1 to Mr. Meadows' deposition)*, and agreed that she could read and understand the definition of a pre-existing condition, and that if you have a pre-existing condition that is not excluded by name or specific description, it is not going to be covered for one year. (*Exhibit B at 23-24*). Mrs. Meadows testified that she knew back on March 12, 2002, what that language said. (*Exhibit B at 24-25*).

Mrs. Meadows understood that there would be some sort of waiting period associated with the insurance coverage because of their medical conditions. (*Exhibit B at 26*). Mrs. Meadows testified that Milford told her that since neither she nor her husband had experienced any problems with their medical conditions since 1995, those conditions would probably be covered within two years. (*Exhibit B at 26*).

Mrs. Meadows testified that Milford did not have the insurance certificate with him during their initial visit *(see Exhibit 3 to her husband's deposition)*.  (*Exhibit B at 28*).  Mrs. Meadows understood that Milford was not making the coverage decision that day, but was taking their application and setting up the necessary payment, and that the application would then have to be submitted to MEGA to determine whether the coverage would be issued.  (*Exhibit B at 30-31*).  Mrs. Meadows signed the application below her husband's signature, where she agreed that the agent had no authority to change or modify the insurance certificate, and testified that she could have understood that when she signed the application.  (*Exhibit B at 49-50*).

Mrs. Meadows testified that they received the insurance certificate and the May 9, 2002 letter *(attached as Exhibits 3 and 4 to her husband's deposition)*, in May of 2002, and she read both of them at that time.  (*Exhibit B at 57*).  Mrs. Meadows admitted that she knew from reading the May 9 letter that it had been necessary for MEGA to attach an exclusionary endorsement to the coverage, and that depending upon the conditions, the exclusions could be reconsidered in one year, and that MEGA would need a written request for consideration of removal along with such medical evidence as might be available at the time that related to the excluded conditions. (*Exhibit B at 35-36, 48*).  Mrs. Meadows also admitted that she did not undertake any efforts to go back to MEGA and request that the exclusions be reconsidered and any exclusions removed from the coverage, but instead went by what she claims Milford told her during an alleged later visit, that it would probably still be two years before those conditions would be covered. (*Exhibit B at 35-38, 48-49*).

Mrs. Meadows does not dispute that the exclusionary endorsement for her husband's heart condition and her urinary condition was contained in the insurance certificate when they received it in May of 2002.  (*Exhibit B at 39*).  Mrs. Meadows testified that she read over the

exclusionary endorsement.  (*Exhibit B at 39*).  Mrs. Meadows admitted that the exclusionary endorsement indicates that there is no coverage or benefits provided for losses due to any disease or disorder of her husband's heart and/or circulatory system, and there is no coverage or benefits provided for losses due to any disorder or diseases of her urinary system, and she knew that when she read that endorsement in May of 2002.  (*Exhibit B at 39-40, 49*).  Mrs. Meadows further admitted that the endorsement indicates that anything in the policy/certificate to the contrary notwithstanding, the endorsement is effective on the effective date of the policy/certificate and would expire concurrently with the policy/certificate unless otherwise terminated.  (*Exhibit B at 40-41*).

With respect to page 8 of the insurance certificate, Mrs. Meadows agreed that the definition of a pre-existing condition means a condition not excluded by name or specific description, and that her husband's and her medical conditions are specifically named or described in the exclusionary endorsement to the insurance certificate.  (*Exhibit B at 42-44*).  Mrs. Meadows admitted that accordingly, their medical conditions would not be included within the definition of a pre-existing condition for purposes of this insurance.  (*Exhibit B at 43*).  Mrs. Meadows testified, however, that Milford told her that if she and her husband did not have any problems for two years with respect to their excluded medical conditions, MEGA would start covering those conditions.  (*Exhibit B at 44*).  Mrs. Meadows nevertheless agreed that she could see language in the certificate that their medical conditions are not covered.  (*Exhibit B at 48*).

## **ARGUMENT**

The cornerstone fraud allegations of Plaintiffs' Complaint are that Defendants, including Milford, made certain fraudulent misrepresentations and/or suppression of material facts with regard to the benefits afforded by a certain health insurance certificate issued by MEGA to

Plaintiffs, and that Defendants, including Milford, breached that contract of insurance, acted in bad faith and committed the tort of outrage in handling claims submitted under the insurance certificate. *(See Complaint)*.

None of the claims asserted by Plaintiffs against Milford are viable.

A.    <u>**Plaintiffs Cannot Establish Fraud.**</u>

Plaintiffs must present substantial evidence of each of the following elements to establish their fraudulent misrepresentation claim against Milford:   "(1) that [Milford] made a false representation; (2) of a material existing fact; (3) on which [Plaintiffs] reasonably relied; and (4) which proximately caused injury or damage to [Plaintiffs]"(citation omitted). *Auto-Owners Insurance Co. v. Abston*, 822 So. 2d 1187, 1196 (Ala. 2001).

In *Foremost Insurance Co. v. Parham*, 693 So. 2d 409 (Ala. 1997), the Alabama Supreme Court held that "the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms." *Foremost*, 693 So. 2d at 421.   That is, to recover in a fraud action, a plaintiff must prove that he or she reasonably relied on the defendant's alleged misrepresentation.   Also, a contracting party has an affirmative duty to read the contracts and related legal documents they sign or receive. *Id.*

Plaintiffs assert that they understood from Milford that MEGA would cover any claims related to Mr. Meadows' heart and circulatory system and Mrs. Meadows' urinary system after two years from when the coverage was issued. (*Exhibit A at 36-37; Exhibit B at 26; Complaint at ¶ 7*).   Plaintiffs, who can read and write, could not have reasonably relied on this alleged misrepresentation, because of the content of the documents provided by MEGA to Plaintiffs.

11

First of all, Mr. Meadows admitted that he could not recall specifically what Milford told him about coverage for his medical condition after two years, but that he could read, and he relied on a certain provision on page 8 of the insurance certificate for the definition of a pre-existing condition, for his belief that after two years, his medical condition would be covered. (*Exhibit A at 83, 85*).  When asked if there were any specific statements that Milford made in that regard on March 12, 2002, Mr. Meadows could not testify to any such statements.  (*Exhibit A at 83-84*).  Mr. Meadows admitted that he was probably not paying as much attention then as he was during his deposition and that he was probably only half-listening during the sales presentation.  (*Exhibit A at 84*).

Also, Mr. Meadows read and understood the language above his signature on the insurance application that "the agent does not have the authority on behalf of the Company to accept the risks, or to make, alter or amend the coverage or to extend the time for making any payment due on such coverage."  *(Exhibit A at 38-39 & Exhibit 3 to the deposition (March 12, 2002 application))*.  Specifically, in focusing on that language under the "Declarations and Agreements" section of his application, Mr. Meadows admitted that he knew the insurance agent could not write a rider or a waiver or issue the coverage and that the company would have to do that.  (*Exhibit A at 88-89 & Exhibit 3 to the deposition (March 12, 2002 application))*. Mr. Meadows was aware that the application would have to be submitted to MEGA, and that the company would make a decision as to whether to provide the coverage.  (*Exhibit A at 39*).

Mrs. Meadows also knew that Milford was not making the coverage decision that day, but was taking the application and setting up the necessary payment, and that the application would then have to be submitted to MEGA to determine whether the coverage would be issued.  (*Exhibit B at 30-31*).  Mrs. Meadows signed the application below her husband's signature,

where she agreed that the agent had no authority to change or modify the insurance certificate, and testified that she could have understood that when she signed the application.  (*Exhibit B at 49-50*).

Mr. Meadows admitted that in the MEGA brochure presented to him during the sales presentation, he could read and understand that a "pre-existing condition means a medical condition, sickness, or injury, not excluded by name or specific description."  (*Exhibit A at 49-50 & Exhibit 1 to the deposition – page 10 of brochure*).   During her deposition, Mrs. Meadows was shown page 10 of the brochure *(see Exhibit 1 to Mr. Meadows' deposition)*, and she agreed that the definition of a pre-existing condition was something she understood, admitted that she could read and understand that language, and understood that if you have a pre-existing condition that is not excluded by name or specific description, it is not going to be covered for one year.  (*Exhibit B at 23-24*).  Mrs. Meadows testified that she knew back on March 12, 2002, what that language said.  (*Exhibit B at 24-25*).

Mrs. Meadows testified that they received the insurance certificate as well as the May 9, 2002 letter *(attached as Exhibits 3 and 4 to her husband's deposition)*, in May of 2002, and she read both of them at that time. (*Exhibit B at 57*).   Mr. Meadows was aware of their right, as outlined in the certificate, to examine the certificate and if unsatisfied that the coverage met their insurance needs, to return it within 10 days after receipt, after which the coverage would be cancelled as of the certificate date, all premiums paid would be refunded, and the certificate would be treated as if it had never been issued.  (*Exhibit A at 53-54 & Exhibit 3 to the deposition (Certificate of Insurance))*.

Mrs. Meadows admitted that she knew from reading the May 9 letter that it had been necessary for MEGA to attach an exclusionary endorsement to the coverage, and that depending

upon the conditions, the exclusions could be reconsidered in one year, and that MEGA would need a written request for consideration of removal along with such medical evidence as might be available at the time which related to the excluded conditions. (*Exhibit B at 35-36, 48*). However, Mrs. Meadows did not undertake any efforts to go back to MEGA and request that the exclusions be reconsidered and any exclusions removed from the coverage, but instead went by what she claims Milford told her during an alleged later visit, that it would probably still be two years before those conditions would be covered. (*Exhibit B at 35-38, 48-49*).

Mr. Meadows also read the May 9 letter and admitted that the letter reflects that MEGA would need a written request for consideration of removal of the excluded medical conditions, along with such medical evidence as may be available at the time that related to those conditions. (*Exhibit A at 71-73*). Mr. Meadows also admitted that the letter indicates that to request the reasons for MEGA's decision, Mr. Meadows should send a written request to MEGA within ninety (90) days of the date of the letter. (*Exhibit A at 73*). Mr. Meadows understood that the letter meant that an exclusionary endorsement had been attached to the coverage when issued (*Exhibit A at 73*), and that there was no coverage for his heart and circulatory condition and no coverage for his wife's urinary condition. (*Exhibit A at 73-74*).

Mr. Meadows also admitted that he did not, within one year of the May 9, 2002 letter, request reconsideration of the endorsement that specifically excluded any coverage for his heart or circulatory system. (*Exhibit A at 74-75*). Instead, he went by the provision on page 8 of the insurance certificate relating to the definition of a pre-existing condition, for his understanding that coverage for his condition would nevertheless be afforded after two years. (*Exhibit A at 75, 77-78, 80-81, 102*). Mr. Meadows, however, admitted that the May 9, 2002 letter does not

14

reflect anything about the exclusions for his and his wife's medical conditions being lifted in two

years.  (*Exhibit A at 80*).

Mr. Meadows acknowledged that page 8 of the insurance certificate contains the

following definition:

> **Pre-Existing Condition** means a medical condition, Sickness or Injury <u>not excluded by name or specific description</u> for which:
>
> 1.    Medical advice, Consultation, or treatment was recommended by or received from a Physician within the two year period before the Effective Date of Coverage; or
>
> 2.    Symptoms existed which would cause an ordinarily prudent person to seek diagnosis, care or treatment within the two year period before the Effective Date of Coverage.

(*Exhibit A at 54-55 & p. 8 of Exhibit 3 (Certificate of Insurance)(underlined emphasis added)*).

Mr. Meadows also agreed that the exclusionary endorsement issued with the insurance

certificate contains the following language:

> THERE IS NO COVERAGE OR BENEFITS PROVIDED FOR LOSSES DUE TO ANY DISEASE AND/OR DISORDER OF THE HEART AND/OR CIRCULATORY SYSTEM ON WILLIAM V MEADOWS.
>
> THERE IS NO COVERAGE OR BENEFITS PROVIDED FOR LOSSES DUE TO ANY DISORDER AND/OR DISEASES OF THE URINARY SYSTEM ON JEANIE L MEADOWS.

(*Exhibit A at 62-63 & Exhibit 3 to the deposition (Certificate of Insurance)*).

When asked whether he agreed that the insurance certificate reflects that if the excluded

medical condition is identified by name or specific description, it is not considered a pre-existing

condition, Mr. Meadows stated that that was not the way he understood it, even though the

language does reflect that fact.  (*Exhibit A at 65, 75-76*).  He admitted that with respect to the

exclusionary endorsement issued with the coverage, diseases and disorders of his heart and

15

circulatory system are excluded specifically by name.  (*Exhibit A at 65*).   Mr. Meadows understood that there was no coverage for his heart or circulatory system  (*Exhibit A at 67*), but testified that he assumed that his excluded condition would be covered after two years.  (*Exhibit A at 77*).  He took the language on page 8 of the insurance certificate for the definition of a pre-existing condition to mean that he nevertheless would be covered for his heart and circulatory system, but admitted that is not what the exclusionary endorsement indicates, and that the endorsement in fact excludes his heart and circulatory system from coverage.  (*Exhibit A at 68*). Mr. Meadows stated that he assumed, reading those two provisions together, that he was not covered for two years.  (*Exhibit A at 69*).  Mr. Meadows, however, admitted that there was nothing in the language of the exclusionary endorsement that reflected anything about non-coverage for only two years.  (*Exhibit A at 64*).

Mrs. Meadows testified that the definition of a pre-existing condition in the insurance certificate means a condition not excluded by name or specific description, and that her husband's and her medical conditions are specifically named or described in the exclusionary endorsement to the insurance certificate.  (*Exhibit B at 42-44*).  Mrs. Meadows admitted that accordingly, their medical conditions would not be included within the definition of a pre-existing condition for purposes of this insurance.  (*Exhibit B at 43*).  Mrs. Meadows agreed that she could see language in the certificate that their medical conditions are not covered.  (*Exhibit B at 48*).

As for the exclusionary endorsement, Mrs. Meadows does not dispute that it was contained in the insurance certificate when they received it in May of 2002.  (*Exhibit B at 39*). Mrs. Meadows testified that she read over the exclusionary endorsement.  (*Exhibit B at 39*). Mrs. Meadows admitted that the exclusionary endorsement indicates that there is no coverage or

benefits provided for losses due to any disease or disorder of her husband's heart and/or circulatory system, and that there is no coverage or benefits provided for losses due to any disorder or diseases of her urinary system, and she knew that when she read that endorsement in May of 2002. (*Exhibit B at 39-40, 49*). Mrs. Meadows further admitted that the endorsement indicates that anything in the policy/certificate to the contrary notwithstanding, the endorsement is effective on the effective date of the policy/certificate and would expire concurrently with the policy/certificate unless otherwise terminated. (*Exhibit B at 40-41*).

In an effort to summarize Plaintiffs' testimony and why their fraud claims must fail, first of all, Mr. Meadows could not testify as to any specific statements that Milford made during the sales presentation with respect to coverage for Mr. Meadows' medical condition after two years. Also, both Plaintiffs knew that Milford could not accept the risks or make, alter or amend the coverage, and that Milford would submit the insurance application to MEGA who in turn would determine what coverage would be issued, if any.

In addition, both Plaintiffs admit that they received, read and understood documents from MEGA back in 2002, which unquestionably contradict the alleged oral misrepresentations made by Milford.   Both Plaintiffs do not dispute that they received, read and understood a May 9, 2002 letter from MEGA, which contained an explanation, in bold, that the coverage had been issued but with an exclusionary endorsement for certain medical conditions.  Plaintiffs were also informed by that letter that they could submit a written request to MEGA within 90 days of the date of the letter, requesting the reasons for MEGA's coverage decision.  The letter further explained to Plaintiffs that their exclusions could be reconsidered in one year, and that Plaintiffs would need to submit a written request for consideration of removal, along with such medical evidence as may be available at the time that related to the excluded medical conditions.

17

Plaintiffs admit that neither one of them undertook any efforts to go back to MEGA and request reconsideration of the exclusions, but instead went by the alleged representations of Milford that it would probably be two years before those conditions would be covered.  Plaintiffs admit that nothing in the May 9 letter reflects that the exclusions would be lifted or rescinded after two years.

Plaintiffs also received and read their insurance certificate.  Mr. Meadows testified that he read and understood the portion of the certificate that if he was not satisfied that the coverage met his insurance needs, he could return the certificate to MEGA within 10 days upon receipt, and that upon receipt of the certificate by MEGA, MEGA would cancel the coverage as of the certificate date, refund all premiums paid, and treat the certificate as if it had never been issued. Also, Plaintiffs admit their understanding of the exclusionary endorsement attached to the certificate and that nowhere therein is it limited to a two-year period.  Mrs. Meadows in fact admitted that the endorsement indicates that anything in the policy/certificate to the contrary notwithstanding, the endorsement is effective on the effective date of the policy/certificate and would expire concurrently with the policy/certificate unless otherwise terminated.   Plaintiffs nevertheless relied on the definition of a pre-existing condition reflected on page 8 of the certificate for their belief that their medical conditions, which they admit were clearly excluded from coverage by the exclusionary endorsement, would nevertheless be covered after two years. However, Plaintiffs did admit during their depositions that such definition does not encompass their medical conditions, since those conditions are excluded by name or specific description in the exclusionary endorsement.

Plaintiffs thus knew or should have known of the terms, conditions and benefits of their insurance certificate, including the exclusionary endorsement, when they received documents

from MEGA along with the May 9, 2002 letter. Those documents put Plaintiffs on notice of the alleged fraud -- that, contrary to Milford's alleged misrepresentation, Plaintiffs' excluded medical conditions would not simply "be lifted or rescinded after two (2) years from the inception of the policy." Instead, as reflected in the language of those documents (particularly the May 9, 2002 letter), the exclusions could be reconsidered in one year.

Here, we have a fraud case where the undisputed evidence indicates that Plaintiffs were capable of reading and understanding their documents (and in fact, did read and understand their documents), but nevertheless made a deliberate decision to ignore written contract terms. As a result, Plaintiffs' reliance on Milford's alleged misrepresentations was not reasonable. Consequently, Plaintiffs cannot establish each of the requisite elements of their fraudulent misrepresentation claims against Milford, because Plaintiffs cannot show that they reasonably relied on Milford's alleged misrepresentations.

B.    **Plaintiffs Cannot Establish Suppression of Material Facts.**

Plaintiffs assert that Defendants, including Milford, suppressed material facts relating to the benefits, particularly as to the length of time of any exclusions for their existing medical conditions. In order to establish a prima facie claim of fraudulent suppression, a plaintiff must produce substantial evidence establishing each of the following elements: "(1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result." *State Farm Fire & Casualty Co. v. Slade*, 747 So. 2d 293, 323-24 (Ala. 1999)(citations omitted). It is clear that a plaintiff's reasonable reliance is an essential element of a suppression claim. *See Allstate Insurance Co. v.*

19

*Ware*, 824 So. 2d 739, 744-45 (Ala. 2002); *Liberty National Life Insurance Co. v. Sherrill*, 551 So. 2d 272, 273 (Ala. 1989); *see also Foremost Insurance Co. v. Parham*, 693 So. 2d 409 (Ala. 1997) (referring to the reasonable reliance standard).

Therefore, to sustain their claim of fraudulent suppression, Plaintiffs must prove, among other elements, the concealment or suppression of material facts by Milford. *Auto-Owners Insurance Co. v. Abston*, 822 So. 2d 1187, 1197 (Ala. 2001)(quoting *Foremost Insurance Co. v. Parham*, 693 So. 2d 409, 423 (Ala. 1997)). However, "[w]here the record indicates that the information alleged to have been suppressed was in fact disclosed, and there are no special circumstances affecting the plaintiff's capacity to comprehend, the plaintiff cannot recover for suppression." *Ex parte Alfa Mutual Fire Insurance Co.*, 742 So. 2d 1237, 1243 (Ala. 1999)(citation omitted). "In other words, plain disclosure to a person competent in intelligence and background to understand the disclosure is the legal antithesis of suppression, by definition." *Allstate Insurance Co. v. Ware*, 824 So. 2d 739, 746 (Ala. 2002).

Plaintiffs cannot show any reasonable reliance on the alleged suppression of material facts, or in fact, that Milford even suppressed any material facts related to the terms, conditions or benefits of the insurance, such as the length of time for any exclusions for existing medical conditions. As discussed above, Plaintiffs admit that they received a May 9, 2002 letter from MEGA, their MEGA insurance certificate, and the exclusionary endorsement, and in fact in their Complaint, admit receipt of and refer to language from those documents. Plaintiffs admit that they read and understood or could have read and understood those documents. Plaintiffs do not dispute that the documents they received from MEGA provided the information allegedly suppressed by Milford. There is no allegation that MEGA and/or Milford took any affirmative action to prevent Plaintiffs from discovering the facts that were allegedly suppressed from them.

20

Therefore, even if, *arguendo*, the possible benefits exclusion based on existing medical conditions had not been fully or properly disclosed by Milford, Plaintiffs knew or should have known of the terms, conditions and benefits of the insurance certificate, including the exclusionary endorsement, when they received those documents along with the May 9 letter from MEGA.  Such documents put Plaintiffs on notice that their excluded medical conditions would not simply "be lifted or rescinded after two (2) years from the inception of the policy." Plaintiffs knew or should have known, from the documents received from MEGA, that depending on their medical conditions, the exclusions could be reconsidered in one year.  As a result, Plaintiffs' reliance on the alleged suppression by Milford, when Plaintiffs had in their possession documents from MEGA that provided the information allegedly suppressed, was not reasonable.  Consequently, Plaintiffs cannot establish their fraudulent suppression claim against Milford.

C.      **Plaintiffs' Fraud and Suppression Claims are Barred by the Statute of Limitations.**

Even if Plaintiffs could prove their fraud and suppression claims against Milford, in accordance with *Foremost*, the statute of limitations has expired on those claims.  The statute of limitations for Plaintiffs' fraud and suppression claims is two years.  *See* Ala. Code §§ 6-2-3, 6-2-38; *see, e.g., Casassa v. Liberty Life Insurance Co.*, 949 F. Supp. 825, 828 (M.D. Ala. 1996). The statute of limitations for fraud and suppression claims is subject to the "discovery rule," and does not begin to run until the plaintiff discovers or should have discovered the fraud.  *See* Ala. Code § 6-2-3.

In *Foremost*, the Court found that the plaintiffs should have discovered the defendant's misrepresentation when the plaintiffs signed and received their sales documents.  *Foremost*, 693 So. 2d at 422.  Because the plaintiffs received their sales documents more than two years before

filing their lawsuit, their misrepresentation claims were barred as a matter of law by the expiration of the applicable two-year statute of limitations. *Id.* The objective standard for determining the accrual date for a fraud or suppression claim imposes a duty to read documents received in connection with a particular transaction. *Id.* at 421.

Therefore, fraud claims accrue upon the earlier of: (1) actual discovery of the alleged fraud; or (2) receipt of a document or contract alerting the plaintiff to the possibility of fraud, if the plaintiff could have read and understood such document and chose to ignore its written terms. *Id.; see also Owens v. Life Insurance Co. of Georgia*, 289 F. Supp. 2d 1319, 1326 (M.D. Ala. 2003); *Alfa Life Insurance Corp. v. Green*, 881 So. 2d 987, 991 (Ala. 2003).

In their Complaint, Plaintiffs assert that the alleged fraud and/or suppression occurred when Milford sold the MEGA insurance certificate to them, which occurred on March 12, 2002. *(Complaint at ¶ 7, Counts III-V).* As discussed above, Plaintiffs admittedly received a May 9, 2002 letter from MEGA and have had the certificate of insurance with the exclusionary endorsement and the May 9 letter in their possession since 2002. Both Plaintiffs read the May 9 letter back in May of 2002, which informed Plaintiffs, in bold, that it was necessary for MEGA to attach an exclusionary endorsement to the coverage of insurance, and that depending on the conditions, the exclusion may be reconsidered in one year by submission of a written request and relevant medical evidence. Both Plaintiffs knew that the letter meant that an exclusionary endorsement was attached to the coverage, such that there was no coverage for Mr. Meadows' heart and circulatory condition and no coverage for Mrs. Meadows' urinary condition. Mr. Meadows testified that the language of that endorsement would reflect the same thing today as it reflected back in 2002. Both Plaintiffs also read their insurance certificate back in 2002, and in

fact are relying on a provision on page 8 of the certificate for their belief that coverage for their excluded medical conditions would be afforded after two years.

Thus, Plaintiffs received documents that they admittedly read and understood or could have read and understood, more than two years before filing this lawsuit, that put them on notice that, contrary to Milford's alleged misrepresentation and/or suppression, Plaintiffs' excluded medical conditions would not simply "be lifted or rescinded after two (2) years from the inception of the policy." Such documents contradict the alleged oral misrepresentations made by Milford and provided the information allegedly suppressed. Plaintiffs should have discovered the alleged fraud or suppression, if any, when they received and read these documents in May of 2002. The two-year statute of limitations for Plaintiffs' fraud and suppression claims against Milford commenced running at that time (*see Auto Owners Insurance Co. v. Abston*, 822 So. 2d 1187, 1195 (Ala. 2001), and expired no later than 2004.[2] Plaintiffs did not file this lawsuit until October 7, 2005.

Plaintiffs' fraud and suppression claims against Milford are barred by the applicable two-year statute of limitations. As a result, there is no possibility that Plaintiffs can establish those claims against Milford, and the Court should find that Milford has been fraudulently joined. *See, e.g., Owens v. Life Insurance Co. of Georgia,* 289 F. Supp. 2d 1319, 1325 (M.D. Ala. 2003); *Bullock v. United Benefit Insurance Co.*, 165 F. Supp. 2d 1255, 1258 (M.D. Ala. 2001); *Levett v. Independent Life & Accident Insurance Co.*, 814 F. Supp. 1053, 1058 (M.D. Ala. 1993).

---

[2]     As discussed, Plaintiffs could have submitted a written request to MEGA within one year for reconsideration of the exclusionary endorsement. However, even if Plaintiffs had made such a request by May of 2003, they still waited more than two years to file this lawsuit.

D.    **Plaintiffs Cannot Establish Breach of Contract or Bad Faith.**

As for Plaintiffs' breach of contract and bad faith claims against Milford, the Alabama Supreme Court has specifically held that a plaintiff cannot pursue breach of contract and/or bad faith claims against an insurance agent arising out of alleged breaches of the insurance contract. *See Ligon Furniture Co. v. O.M. Hughes Insurance, Inc.*, 551 So. 2d 283 (Ala. 1989).  Four years later, the Alabama Supreme Court reaffirmed its ruling in *Ligon* that a breach of contract claim does not exist against a broker who placed insurance coverage for the plaintiff.  *See Pate v. Rollison Logging Equipment, Inc.*, 628 So. 2d 337 (Ala. 1993); *see also Bullock v. United Benefit Insurance Co.*, 165 F. Supp. 2d 1255, 1257 (M.D. Ala. 2001)(finding that the insurance agent was not a proper defendant for a breach of contract claim by the insured); *McDonald v. Integon General Insurance Co.*, 1996 U.S. Dist. Lexis 16890 (S.D. Ala. 1996)(insurance agent, who was not a party to the insurance contract, could not be liable for breach of contract or bad faith); *Vari-Care, Inc. v. ITT Hartford Insurance Group*, 1994 U.S. Dist. Lexis 10326 (S.D. Ala. 1994)(bad faith claim could not be maintained against a non-party to the insurance contract); *see also Wright v. State Farm Fire & Casualty Co.*, 1997 U.S. Dist. Lexis 2988 (M.D. Ala. 1997)(the fact that Alabama law does not recognize a breach of contract and/or bad faith claim against the insurance agent/broker for alleged breaches of the insurance contract is a basis to support a claim of fraudulent joinder).

Here, unquestionably the insurance contract is between MEGA and Plaintiffs – the insurer and the insureds.  *(Exhibit 3 to Williams Meadows' deposition (Certificate of Insurance)).* Milford is not a party to the insurance contract.  It is clear from the holdings in *Ligon* and its progeny, that an insurance agent/broker is not a party to the insurance contract issued by an insurance company to the insured.  Since an insurance agent/broker is not a party to the

insurance contract, causes of action do not exist against the insurance agent/broker, in this case Milford, for alleged breach of contract and/or bad faith under Alabama law. Milford is not a proper defendant for Plaintiffs' breach of contract claim or bad faith claim. Accordingly, there is no possibility that Plaintiffs can establish a breach of contract or bad faith claim against Milford.[3]

**E.    Plaintiffs Cannot Establish Outrage.**

Plaintiffs assert a claim for outrage against Defendants, including Milford. In *American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980), the Alabama Supreme Court held that a plaintiff must establish: (1) that the defendant's conduct was intentional or reckless; (2) that it was extreme and outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it. Specifically, the Court stated "[t]he emotional distress [resulting from the conduct] must be so severe that no reasonable person could be expected to endure it. The recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme . . . . by extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Inmon*, 394 So. 2d at 365 (citations omitted).

---

[3]    Plaintiffs have asserted in earlier briefing that MEGA cannot satisfy the "new requirement for establishing fraudulent joinder" created by the Fifth Circuit Court of Appeals in *Collins v. American Home Products Corp.*, 343 F.3d 765 (5th Cir. 2003), *cert. denied*, 125 S. Ct. 1823, 161 L. Ed. 2d 755 (2005). *Collins* is inapplicable to this case. In *Collins*, the Court found that a case was not removable under a fraudulent joinder theory if the grounds for asserting fraudulent joinder were also a complete defense to the claims asserted against the nonresident defendant. Here, the grounds for asserting fraudulent joinder do not provide MEGA with a complete defense to all of the claims asserted against MEGA, as evidenced by Plaintiffs' claims for breach of contract and bad faith which, under Alabama law, lie only against MEGA and not Milford (as discussed in this section of MEGA's supplemental brief). Therefore, *Collins* does not preclude this lawsuit from being removed to this Court.

Plaintiffs assert that Milford told them that any exclusionary endorsement issued with the MEGA insurance certificate would be lifted or rescinded after two years from the inception of the certificate.  Plaintiffs, however, admittedly received, read and understood or could have read and understood documents from MEGA, which outlined the coverage's terms, conditions, benefits and exclusions.  As discussed above, the clear language contained in those documents shows that Plaintiffs' fraud and suppression claims against Milford have no merit, primarily because Plaintiffs could not have reasonably relied on Milford's alleged misrepresentations or suppression of material fact.   Plaintiffs' claims against Milford for breach of contract and bad faith also cannot be established under Alabama law.   Moreover, Plaintiffs knew of their 10-day right to examine the certificate upon receipt, and if not satisfied that it met their insurance needs, they could have, within that time frame, cancelled the coverage, received a refund of all premiums paid, and had the certificate treated as if it had never been issued.  Plaintiffs also knew that they could have submitted a written request to MEGA within 90 days of the May 9, 2002 letter, requesting the reasons for MEGA's coverage decision.  Furthermore, Plaintiffs knew that they could have submitted in one year a written request for removal of their exclusions, along with medical evidence related to their medical conditions. There simply is no basis for any claim under Alabama law that Milford's alleged misconduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency," or could be "regarded as atrocious and utterly intolerable in a civilized society."   Plaintiffs cannot establish their claim for outrage against Milford.

**F.     Plaintiffs' Outrage Claim is Barred by the Statute of Limitations.**

In *Archie v. Enterprise Hospital & Nursing Home*, 508 So. 2d 693, 695 (Ala. 1987), the Alabama Supreme Court suggests that all outrage claims are governed by the two-year statute of

limitations found in <u>Ala. Code</u> § 6-2-38.  *See also Jenkins v. United States Fidelity & Guaranty Co.*, 698 So. 2d 765, 768 n.5 (Ala. 1997).   According to the Complaint, Plaintiffs' claims for outrage stem from the alleged misrepresentations and/or suppression of material fact made by Milford when Plaintiffs applied for the MEGA insurance certificate.   As discussed herein, Plaintiffs applied for and received and read their insurance certificate and other documentation from MEGA in 2002, which contradict the alleged oral misrepresentations made by Milford and provided the information allegedly suppressed.   Plaintiffs, however, did not file this lawsuit until October 7, 2005.[4]  Consequently, Plaintiffs' claim against Milford for outrage is barred by the expiration of the two-year statute of limitations.

## <u>CONCLUSION</u>

Based upon the arguments and evidence presented in MEGA's Notice of Removal, its initial brief opposing remand, and herein, Defendants have proven that this Court has diversity jurisdiction pursuant to the provisions of 28 U.S.C. § 1332.  Because Milford was fraudulently joined and is due to be dismissed, complete diversity exists among Plaintiffs and MEGA.  In addition, it is undisputed that the amount in controversy for federal diversity jurisdiction is satisfied.  Defendants respectfully request that the Court deny the Plaintiffs' Motion for Remand and Costs.

*s/ Pamela A. Moore*_____
JAMES W. LAMPKIN II (LAMPJ7474)
PAMELA A. MOORE (MOORP5421)
Attorneys for Defendants

OF COUNSEL:

ALFORD, CLAUSEN & McDONALD, LLC
One St. Louis Centre, Suite 5000

---

[4]      Also, see footnote 2 *supra*.

Mobile, Alabama  36602
(251) 432-1600
(251) 432-1700 (fax)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 16, 2006, the foregoing document was electronically filed with the Clerk of this Court using the CM/ECF system, which will send notification of such filing to the following:

Gary D. Bradshaw, Esq.                    Steven E. Blair, Esq.
P.O. Box 311412                           P.O. Box 310843
Enterprise, AL  36331-1412                Enterprise, AL  36331-0843
gbradshaw@adelphia.net                    sblair506@hotmail.com


Dwain D. Hartwick, Esq.                   Wilmer R. Tharpe, Esq.
P.O. Box 311526                           621 W. State Highway 92
Enterprise, AL  36331-1526                Newton, AL 36352-7935
dhartwick@ala.net                         wrtharpe@aol.com


                                          *s/ Pamela A. Moore*_____
                                          COUNSEL

29