1

WILLIAM MEADOWS

1   IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3            SOUTHERN DIVISION    ORIGINAL

4

5   CIVIL ACTION NO.: 1:05-CV-1091-MBF-VPM

6

7   WILLIAM MEADOWS and JEANIE MEADOWS,

8            Plaintiffs,

9        vs.

10  THE MEGA LIFE and HEALTH INSURANCE

    COMPANY, and its agent, MICHAEL JOSHUA

11  MILFORD, et al.,

12          Defendants.

13

14        S T I P U L A T I O N S

15

16        IT IS STIPULATED AND AGREED by and

17  between the parties, through their

18  respective counsel, that the videotaped

19  deposition of WILLIAM MEADOWS, may be taken

20  before FRANCY HUGULEY HOPSON, Commissioner,

21  at the Law Office of Dwain Hartwick, 105 E.

22  College Street, Enterprise, Alabama, on the

23  17th day of February, 2006.        **Exhibit A**

WILLIAM MEADOWS

1    buildings I put up were not for -- for farm
2    purposes.
3         Q    Okay.
4         A    They were commercial.
5         Q    Okay.  But let's say like working at
6    McDonald's or Wal-Mart?
7         A    No.  No.  No.  No.
8         Q    Nothing like that?
9         A    (Witness shakes head negatively.)
10        Q    Most of your employment, since the
11   time you were seventeen, when you started to
12   work with Harrison and Ellis, up through
13   today, has been in the construction
14   industry; is that correct?
15        A    Right.
16        Q    How far did you go in school?
17        A    I don't remember whether I went to
18   the ninth or the tenth.  But I didn't finish
19   to, whichever one it was.
20        Q    Have you ever gone back and gotten
21   your GED?
22        A    No, sir.
23        Q    Can you read and write?

WILLIAM MEADOWS

1      A    Fair.

2           BY MR. BRADSHAW:  What did you say?

3           THE WITNESS:  Fair.

4      Q    (BY MR. LAMPKIN:)  If there's

5  something that you can't read and

6  understand, who do you rely on to read it

7  and tell you what it's about?

8      A    I try to figure it out myself.

9      Q    Okay.  Do you ever rely on your

10  wife?

11      A    No.

12      Q    What about your son?

13      A    No.

14      Q    On some of this machinery that

15  you're operating on, or performing

16  maintenance and repairs on at Sessions, do

17  you have ever have to refer to any sort of

18  manual or book on it?

19      A    No.

20      Q    Okay.  Do you ever read like any

21  type of magazines, or newspapers, or

22  something just --

23      A    Sometimes I'll read through the

WILLIAM MEADOWS

1    with the time doings, and things like that.
2    And I don't really --
3        Q    I'm just asking -- Mr. Meadows, I'm
4    just asking from the best of your memory.
5    Your wife may remember this a lot better.
6    And I'm going to talk to her in just a
7    little bit.  And I just want the best you
8    can recall.  Okay?
9        Just do the best you can on times.  I'm
10   not going to hold you to exact times on
11   something like that.
12       A    That's like the medicines, I don't
13   -- I don't know what medicines I'm taking.
14       Q    Well, I'll ask your wife about that.
15   I don't know that that's all that crucial.
16   But I'm just trying to get an idea.
17       Mr. Meadows, tell me how it came about
18   that you purchased the Mega policy.
19       A    Well, we were hunting -- I guess you
20   could say we were hunting some insurance.
21   And we saw some advertisement on TV.  And I
22   think we saw -- got some brochures or
23   something.  I don't recall exactly.  And we

WILLIAM MEADOWS

1  got it.

2      Q    Okay.  Do you know if y'all called

3  an eight-hundred number, and then somebody

4  came out?  Or did somebody just show up and

5  knock on the door or --

6      A    We contacted them.

7      Q    Okay.  You contacted them.  And then

8  somebody came out?

9      A    Yeah.

10     Q    Okay.  And that -- was the first

11  person that came -- let me ask you this.

12  Was the only person that came out Michael

13  Milford?

14     A    As far as I can remember, yes.

15     Q    Can you describe Mr. Milford for me;

16  what's he look like?

17     A    I couldn't tell you.

18     Q    Well, was he --

19     A    I mean -- you know, I came in from

20  work.  Met with him.  He described -- you

21  know, he told us who he was.  But I couldn't

22  tell you if he walked in that door.

23     Q    You wouldn't recognize him if you

WILLIAM MEADOWS

1    -- he marked in the papers for us.

2        Q    Okay.

3        A    He explained some stuff.

4        Q    Okay.  What do you recall -- and let

5    me ask you this.  As I understand it, what

6    y'all signed up for was a plan that provided

7    a three-hundred-dollar room and board

8    benefit and a two-thousand-dollar deductible

9    based on the application.  Do you recall him

10   going over that information with you?

11       A    He may have.  I don't -- like I say,

12   I -- I didn't get in too much or -- that I

13   can remember.  We didn't get into much.  We

14   was wanting coverage.  And when he asked did

15   we have -- in some of his questions -- any

16   prior illnesses or whatever, I remember

17   telling him, yes, and explaining to him what

18   we had.

19       Q    Okay.  So in going through -- you

20   remember him going through the application.

21   The copy that I have is Bates labeled

22   ME000064 through 65 -- no, excuse me -- 66,

23   it looks like.

WILLIAM MEADOWS

1      A    You know, I don't -- I don't

2   remember any of the specifics here.

3      Q    That's fine.  That's all I'm asking

4   -- that's all I'm asking you to tell me.

5   But you do recall there was a discussion

6   about whether you'd had any prior medical

7   conditions?

8      A    Right.

9      Q    And if we look on -- is any of the

10  writing on here on this application, which

11  I've already previously identified by Bates

12  label -- is any of that writing on there

13  yours?

14     A    It looks like that right there is

15  mine.

16     Q    Is that your --

17     A    It looks like my signature.

18     Q    Does that like your signature?

19     A    It looks about like it.

20     Q    Okay.  And I notice that we've got

21  some conditions listed.  It looks like high

22  blood pressure, bladder.

23     A    Yeah.

WILLIAM MEADOWS

1      Q    I can't read it from over there.  It
2   says bladder problem and then cholesterol?
3      A    Yeah.
4      Q    High blood pressure being yours,
5   cholesterol being yours, and then the
6   bladder problem being your wife's.  Do you
7   recall a discussion about that?
8      A    If I remember correctly, this is
9   what led to the two-year -- I don't know
10  what you call it -- rider, or whatever it
11  is -- two years of not being covered.
12     Q    What -- tell me what you recall the
13  discussion being after you and your wife
14  advised Mr. Milford of those medical
15  conditions?
16     A    It seemed like he told me -- well,
17  he did.  He said he wrote it down.  It
18  seemed like he told me that it wouldn't be
19  any problem, that it would probably be --
20  again, I don't -- I don't know the word.
21     But there would be a -- that wouldn't be
22  covered.  We wouldn't -- I wouldn't be
23  covered for heart doings, and Jeanie would

WILLIAM MEADOWS

```
1    not be covered for her bladder doing on a
2    pre-existing for two years.
3         And when he came back with the
4    paperworks after the first deal, then he --
5    he showed me.  And that it would not -- he
6    said it'd probably be a two-year deal.  And
7    he showed me that in the deal, it was going
8    be -- we would not be covered for two years.
9         Q    Okay.
10        A    And it's highlighted in some of the
11   paperworks somewhere.
12        Q    Are you saying that Mr. Milford came
13   back and brought you the paperwork on the
14   policy?  Or did you get that in the mail?
15        A    Did he not come back twice?  I'm
16   sorry.
17        Q    Well, you tell me what you remember.
18        A    It seemed like he brought -- he came
19   twice.  I don't -- I don't remember whether
20   I met with him.  I know I did.  But,
21   anyway -- I don't remember.
22        Q    Okay.
23        A    But I remember him talking about we
```

WILLIAM MEADOWS

1    wouldn't be covered --

2        Q    Okay.

3        A    -- on that for two years.  And it

4    was highlighted.

5        Q    And you understood that this was an

6    application, right, and it had to be

7    approved by the company first?

8        A    That's what he asked.  If I'm right,

9    that's the one that he filled out, that we

10   had to tell him what our pre-existings were,

11   and stuff like that.

12       Q    Okay.  Well, look right here.  If

13   you look, it says declarations and

14   agreements.  I agree that -- I need to find

15   a copy, so I can kind of read along.

16       A    I haven't got my glasses.

17       Q    You can't -- you can't read it

18   because you don't have your glasses?

19       A    I can read it enough to follow along

20   with you.

21       Q    Okay.  Let's look at:  I agree to

22   that.  And then it says A.  But skip down to

23   C.  The agent does not have authority on

WILLIAM MEADOWS

1    behalf of the company to accept this or to

2    make or offer or amend a coverage, or to

3    extend the time for making any payment due

4    on such coverage, correct?

5         A    I read that.

6         Q    Can you read that?

7         A    Yep.

8         Q    And you signed that below with your

9    signature, right?

10        A    Yep.

11        Q    But you understood that this was

12   going to have to be sent in, and the company

13   would have to make a decision --

14        A    Right.

15        Q    -- whether they were going to

16   provide the coverage?

17        A    Right.

18        Q    Okay.  We're talking at the same

19   time.  And it makes her job tougher.  Let me

20   finish my question, and then answer.  Okay?

21        Now, do you recall -- is there anything

22   else that Mr. Milford said that -- at that

23   time, back in March of -- I believe it's

WILLIAM MEADOWS

1    about it -- like I say, I don't remember too
2    much about it.  But the only thing I
3    remember about it was that we were shown --
4    or I was shown that we got a two-year --
5    that it wouldn't be covered.
6        Q    Okay.
7        A    I was under the impression of --
8    after two years, that I would be -- not only
9    me, but Jeanie also, that after the two
10   years, that we would be covered.  And
11   that's -- that's the reason that we went
12   with the coverage.
13       Q    The reason -- what was it that was
14   said that made you think that you would have
15   coverage after two years?  And I assume you
16   mean coverage for the conditions listed --
17       A    Right.
18       Q    -- on the application?
19       A    Right.
20       Q    What was it that was said exactly
21   that led you to believe that you would have
22   coverage after two years?
23       A    The highlighted area.

WILLIAM MEADOWS

1    Q    The highlighted area.  Okay.  And

2  that highlighted area -- I don't have it yet

3  -- is actually contained in the policy,

4  correct?

5    A    It's in the papers that we were

6  given, yeah.

7    Q    Were you given those papers on March

8  12, 2002?

9    A    Datewise, I couldn't tell you.

10    Q    Were you given those papers later on

11  when -- at some later point?

12    A    I don't know.  I don't know.

13    Q    The reason I ask is because what I

14  saw on the documents that were produced,

15  being the highlighted area, was actually in

16  the policy that was issued, which Mr.

17  Milford would not have had on the day that

18  he met with you on March 12th, 2002.  Do you

19  understand that?

20    A    Yeah.

21    Q    But he didn't leave the policy with

22  you, did he?

23    A    I don't know.

WILLIAM MEADOWS

1    understand that, Mr. Meadows?

2        A    I read this.  Yes, I did.  Now, the

3    only thing I can get out of it -- in talking

4    about pre-existing -- is the pre-existing

5    that we had.  And, like I said, he told me

6    -- and I can't remember whether he said it'd

7    probably be a one- to two-year, or what it

8    was.

9        Q    Okay.  Well, let me go over this

10   with you.  Do you see where it says --

11       A    But I don't recall.  I'm -- I'm

12   sorry.

13       Q    Pre-existing condition means a

14   medical condition, sickness, or injury, not

15   excluded by name or specific description?

16       A    Yeah.

17       Q    Do you understand that?

18       A    Yeah.

19       Q    What that's saying is that a

20   pre-existing condition is something that's

21   not excluded by name or specific

22   description.  Do you understand that?

23       A    When it's not excluded?

WILLIAM MEADOWS

```
 1        Q    When it's not excluded by name or
 2   specific description.
 3        A    That means the one that you had that
 4   wasn't mentioned?
 5        Q    Right.  That's not mentioned.
 6        A    Right.
 7        Q    Okay.  So you understand that?
 8        A    I understand that part.
 9        Q    Okay.  Do you recall if you received
10   your policy sometime in May of 2002?
11        A    It seems like I remember we got the
12   policy.
13        Q    Do you remember if you got that
14   policy in the mail or if --
15        A    I -- I don't know.
16        Q    You don't know?
17        A    I don't.
18        Q    We'll substitute that page when it
19   comes in, but we'll make this Exhibit 2.
20   I'm going to show you what I'm going to mark
21   as Defendants' Exhibit 2 to your deposition.
22   I can read it, barely.
23
```

WILLIAM MEADOWS

1  at it and see if he agrees with my
2  representation.
3          BY MR. BRADSHAW:  I do, because I've
4  seen the other one.
5      Q    (BY MR. LAMPKIN:)  Okay.  And you
6  don't know what came in that?
7      A    (Witness shakes head negatively.)
8      Q    You need to answer out loud.
9      A    Oh, I'm sorry.  No, I don't.
10     Q    I'm going to mark this as Exhibit 3.
11
12     (Defendants' Exhibit No. 3 was
13      marked for identification and
14      copy of same is attached hereto.)
15
16     Q    (BY MR. LAMPKIN:)  And this is a
17  copy of the insurance policy that was in the
18  documents I looked at this morning, which
19  was a red, white and blue folder that your
20  attorney had.  And this is going to be
21  Exhibit 3.  This is your insurance policy.
22  Do you recollect receiving that sometime in
23  May of 2002?

WILLIAM MEADOWS

1    A    I think we received something like
2    this here or this.
3    Q    When you got that, did you look over
4    it?
5    A    I read -- read over part of it.
6    There was a -- there was a -- the one that
7    we got had a -- had a highlighted area that
8    was shown to me.
9    Q    You said it was shown to you.  Who
10   showed it to you?
11   A    I don't remember.  It seems like
12   that the representative showed it to me when
13   he was making -- telling us that we wouldn't
14   have the coverage for two years.
15   Q    Okay.  If you look over at the first
16   page, you got -- it says ten-day right to
17   examine the certificate.  I'm going to look
18   on over here, so you can look at that.  It
19   says:  It's important to us that you
20   understand and are satisfied with the
21   coverage being provided to you.  If you are
22   not satisfied that this coverage will meet
23   your insurance needs, you may return this

WILLIAM MEADOWS

1    certificate to us at our administrative

2    office in North Richland Hills, Texas,

3    within ten days after you receive it.  Upon

4    receipt, we will cancel your coverage as of

5    the certificate date, and refund all

6    premiums paid, and treat the certificate as

7    if it were never issued.  Do you remember

8    reading that part of it?

9        A    Yeah, I think I read that.

10       Q    Okay.

11       A    It seemed like I did.

12       Q    And that's telling you that -- to

13   look over it, to make sure you're happy with

14   it.  And if you're not, you can get your

15   money back, correct?

16       A    Yeah.  I understand it.

17       Q    Now, do we have the pink copy now?

18   We will substitute page eight here.  Look at

19   page eight.  You might have to flip it over,

20   Mr. Meadows.  And I'll represent to you that

21   this is under the definitions section of the

22   policy, which begins on page five.

23           And, again, it says, pre-existing

WILLIAM MEADOWS

1   condition.  It's defining pre-existing

2   condition.  It says, pre-existing -- tell me

3   if this is what the document says.

4   Pre-existing condition means a medical

5   condition, sickness, or injury, not excluded

6   by name or specific description, for which,

7   one, medical advice, consultation, or

8   treatment was recommended by or received

9   from a physician within the two-year period

10  before the effective date of coverage; or,

11  two, symptoms existed which would cause an

12  ordinarily prudent person to seek diagnosis,

13  care, or treatment, within the two-year

14  period before the effective date of

15  coverage.  Is that what it says?  Is that

16  what the document says?

17      A    That's what the document says.

18      Q    Okay.  And that's what's highlighted

19  there, correct?

20      A    (Witness nods head affirmatively.)

21      Q    Is that right?

22      A    Yes.

23      Q    You had had previous medical

WILLIAM MEADOWS

1          BY MR. LAMPKIN:  This is -- it's
2    just an endorsement.
3          BY MR. BRADSHAW:  Wellness rider?
4          BY MR. LAMPKIN:  No.  This is the
5    endorsement that specifically excludes
6    coverage for heart and circulatory
7    conditions for Mr. Meadows, and bladder and
8    urinary system for Mrs. Meadows.  It says
9    HEND 96.
10          BY MR. BRADSHAW:  I'm sorry.  Is it
11    toward the front?
12          BY MR. LAMPKIN:  It's toward the --
13    it's kind of towards the -- it's kind of --
14    almost in the middle.  It's just before the
15    Legend Prescription Drug Expense Rider.
16          BY MR. BRADSHAW:  I got you, HEND
17    96.
18      Q    (BY MR. LAMPKIN:)  Mr. Meadows, I'm
19    going to ask you to look at that document
20    for a minute.  It says it's an endorsement
21    attached to and made part of the policy
22    certificate, 053301047.
23          In consideration of issuance, the

WILLIAM MEADOWS

1    policy certificate is hereby amended and

2    modified as follows.  There is no coverage

3    or benefits provided for losses due to any

4    disease or disorder of the heart and/or

5    circulatory system on Williams V. Meadows.

6    There is no coverage or benefits provided

7    for losses due to any disorder and/or

8    diseases of the urinary system on Jeanie L.

9    Meadows.  Is that what it says?

10        A    That's what it says.

11        Q    Okay.  You understand the best thing

12    for you -- you don't have coverage for

13    anything related to your heart or

14    circulatory system?

15        A    Right.

16            BY MR. BRADSHAW:  No, you asked him

17    what he understands.  Let him finish his

18    answer.

19            BY MR. LAMPKIN:  Okay.

20            THE WITNESS:  I understood, when I

21    read that -- when I read this here, I

22    understand what that's saying.

23            BY MR. LAMPKIN:  Okay.

WILLIAM MEADOWS

1          THE WITNESS:  That there's no

2     coverage.  But I also understand, when I

3     look back at the highlighted area, that that

4     means for two years.  Now, that's -- that's

5     what I -- that's what I gathered.

6          Q    (BY MR. LAMPKIN:)  There's nothing

7     in this document that says anything about

8     two years, is there?

9          A    Not in this one, no.

10         Q    Okay.  It says:  There is no

11    coverage or benefits provided for losses due

12    to any disease and/or disorder of the heart

13    and/or circulatory system on William V.

14    Meadows?

15         A    Right.

16         Q    That's what it says, right?

17         A    That's what it says.

18         Q    Would you agree with me that heart

19    and circulatory system would be named or

20    specific description of parts of your body?

21         A    Yeah.

22         Q    Now, let's go back over to the

23    pre-existing condition -- which I think we

WILLIAM MEADOWS

1    need to read -- we can read in the two

2    years, which it's not two years.  It's a

3    one-year.

4        A    That's -- that's what I went by,

5    because that was what was highlighted.

6        Q    Okay.  Now, let's flip back over to

7    that.  And that says, does it not -- let me

8    find my copy of it.  Again, we're defining

9    pre-existing conditions.  Pre-existing

10   condition means a medical condition,

11   sickness, or injury, not excluded by name or

12   specific description, correct?

13       A    Yeah.

14       Q    And over here, with this other

15   endorsement, diseases and disorders of your

16   heart and circulatory system are excluded by

17   name, aren't they?

18       A    Uh-huh.  (Witness indicates

19   affirmatively.)

20       Q    Is that correct?

21       A    According to that.

22       Q    Okay.  And you can -- you agree that

23   that's what that says?

WILLIAM MEADOWS

1    rely on part there of what he said in the

2    highlighted and ignore the other part of it.

3    If he's going to rely on that, he's bound by

4    the whole thing.

5        And it's very convenient to sit there

6    and say, I don't understand part of it,

7    whenever you've got not excluded by name or

8    specific description right there in your

9    face.  And you know that there's an

10   exclusion by name and specific description.

11   You can't rely on part of it and not rely on

12   all of it.

13       BY MR. BRADSHAW:  My object is not

14   to that part -- about that.  My objection

15   is, you went back to this form and said, Mr.

16   Meadows, if you had read that.  He told you

17   he read that, and then told you what he

18   understood it to mean.

19       Q   (BY MR. LAMPKIN:)  Mr. Meadows, you

20   understood today that this says there's no

21   coverage for your heart or circulatory

22   system, right?

23       A   I understand that.

WILLIAM MEADOWS

1     Q   And if you had read that back in

2   2002 -- it says the same thing today as it

3   said back in 2002, doesn't it?

4     A   Right.

5     Q   And you've had that document in your

6   possession since May of 2002?

7     A   Yeah.  But, like I told you a while

8   ago, I can read that, and that tells me that

9   I'm not covered.

10     Q   Okay.

11     A   But then when I read -- get back

12   over here, and it tells me my time frame --

13   then that tells me that after the time

14   frame, that tells me I'll be covered.

15     Q   Okay.

16     A   Or that's what I took it as.

17     Q   That's what you took it as.  But

18   that's not what the endorsement says, is it?

19     A   That's not what that says.

20     Q   And that being this endorsement that

21   excludes your heart and your circulatory

22   system?

23     A   Right.

WILLIAM MEADOWS

1      Q    I just want to define that.

2      A    But when I go back over here, and I

3   saw the highlighted area, where it says for

4   two years, then that tells me that, you

5   know, you're not covered for two years.

6      Q    Okay.  So you assumed that, reading

7   those two together, you would not be covered

8   for two years?

9      A    That's right.

10     Q    Let me ask you something.  And I

11  seemed to have misplaced it.  In the

12  complaint -- your complaint admits that you

13  received your policy and a letter -- a

14  letter dated May 9, 2002.  That's what your

15  complaint alleges.  And I can't find my May

16  9, 2002, letter right now.

17          BY MR. BRADSHAW:  Do you want a copy

18  of it?

19          BY MR. LAMPKIN:  I've got it

20  somewhere.  I just don't know where it is.

21     Q    (BY MR. LAMPKIN:)  Do you recall

22  receiving a letter, providing you with a

23  copy of your policy, and the letter was

WILLIAM MEADOWS

1    Q    (BY MR. LAMPKIN:)   And the complaint

2   in this case -- paragraph 9 -- specifically

3   admits that this letter was received by the

4   Meadowses.

5       Mr. Meadows, take a moment and look at

6   that.  I'm going to try to find my copy of

7   it, so I can go over it with you right

8   quick.

9       Have you had a chance to read over that

10  letter, Mr. Meadows?  Have you had a chance

11  to read the letter?

12   A    I've read over it a little bit.

13   Q    Okay.  If you look down, it's dated

14  May 9, 2002.  And it's referring to policy

15  number 053301047.  It says:  Dear Mr.

16  Meadows, we appreciate the confidence you've

17  placed in us.  It is our pleasure to accept

18  you for coverage under this benefits plan.

19      We have enclosed your coverages of

20  insurance and ask that you read it

21  carefully.  We want you to understand all

22  benefits available to you and your

23  dependants, as you review your coverages --

WILLIAM MEADOWS

1    and this is coverage with a parenthetical

2    line, s, and then closed parenthetical --

3    other insurance.

4        Please check the attached enrollment

5    application carefully.  Are the answers to

6    the questions completely and accurately

7    recorded?  If not, please notify us right

8    away.

9        We want your coverage of insurance to

10   be properly issued, so that when you call

11   upon the benefits provided, you can be

12   confident that they will be paid promptly

13   and accurately.

14       And in bold -- in the next paragraph --

15   this is the third paragraph in -- based on

16   the medical information received, it was

17   necessary for us to attach an exclusionary

18   endorsement to your coverage of insurance --

19   and that ends the bold -- depending on the

20   conditions, the exclusion may be

21   reconsidered in one year.

22       We will need your written request for

23   consideration of removal, along with such

WILLIAM MEADOWS

1   medical evidence, as may be available at the

2   time, which relates to the excluded

3   conditions.

4       To request the reasons for our

5   decision, send your written request to us

6   within ninety days of the date of this

7   letter.  Is that what that part of the

8   document says?

9       A    That's what I read.

10      Q    Did you read this back in May of

11  2002?

12      A    I don't remember if I did.  Even --

13  even what I'm reading now, it still tells me

14  the same thing -- that after a period of

15  time, I'll be covered.  I'm not going to be

16  covered until.

17      Q    Well, it says:  It was necessary for

18  us to attach an exclusionary endorsement to

19  your coverage of insurance, correct?

20      A    I read that.

21      Q    And you understand that?

22      A    Yep.

23      Q    And that's that document we looked

WILLIAM MEADOWS

1   at just a few minutes ago, the Henderson --
2   HEND 96, that says there's no coverage
3   for all the circulatory --
4       A    Right.
5       Q    -- conditions for you, and no
6   coverage for urinary conditions for your
7   wife, correct?
8       A    Right.
9       Q    Okay.  And then it says, in the next
10  sentence of Defendants' Exhibit 4, that
11  we've discussed, in the third paragraph:
12  Depending on the conditions, the exclusion
13  may be reconsidered in one year.
14      We will need your written request for
15  consideration of removal, along with such
16  medical evidence, as may be available at the
17  time, which relates to the excluded
18  conditions.
19      Did you, within one year of May 9,
20  2002, request reconsideration of the
21  exclusion -- or the endorsement, that it
22  specifically excluded any conditions for
23  your heart or circulatory system?

WILLIAM MEADOWS

1    A    No, because I was under the

2   impression of what I had back here, that it

3   was two years, and that I would be covered

4   after two years.

5        So I didn't pay any of this right here

6   any attention.  I went by what was in the

7   paper that was highlighted.

8        Q    But you agree with me that what you

9   were going by specifically states that if

10  it's identified by name or specific

11  condition, it's not a pre-existing

12  condition?

13       A    Well, it may be the way it's -- to

14  me -- but to me, it was something that he

15  asked me.  I told him the truth.  I told him

16  that I had the condition.  He wrote it down.

17  And when the paper came back:  You were not

18  going to be covered for two years.

19       Q    Okay.  I understand that that's what

20  part of that says.  But you agree with me

21  that that --

22       A    I don't --

23       Q    You do agree with me that the other

WILLIAM MEADOWS

1   part of that says, that if it's identified

2   by name or specific description, it's not a

3   pre-existing condition?

4        A    Well, it wasn't the way I understood

5   it.

6        Q    Okay.

7        A    The way I understood it, he said --

8   did I ask -- did I have any pre-existing

9   condition.  I said, well, we had that done.

10  And I told him that we had found some

11  blockage in the heart.  So that was written

12  down.

13       And, like I say, when we got that --

14  got it back, it was highlighted for two

15  years.  And my -- my understanding was, that

16  after the two years, we would be covered.

17       Q    Was that understanding based on

18  solely reading that language?

19       A    Well, he -- it seems like the

20  insurance -- the -- man told me that it

21  would be two years also, because he's the

22  one that -- somebody highlighted it for

23  us --

WILLIAM MEADOWS

1    Q    Well --

2    A    -- to make -- to make it, to where

3    he could show us.

4    Q    Well, this letter says:  Enclosed is

5    your coverage of insurance; does it not?

6    A    Yeah.

7    Q    So it looks like this was -- may

8    have been mailed to you?

9    A    Well, it may have been.  I don't

10   remember.  But I do remember, when I looked

11   through seeing the pink, whether it was --

12   you know, I know that's been a while back.

13   And I don't -- I don't remember.  But I do

14   know that that highlighted area caught my

15   eye.

16   Q    Okay.

17   A    And, like I said a while ago, if --

18   the two years, I assumed we were going to be

19   covered.

20   Q    And you do agree with me that this

21   highlighted area specifically says

22   pre-existing condition means a medical

23   condition, sickness, or injury, not excluded

WILLIAM MEADOWS

1    by name or specific description?

2        A    Yeah.  Well, if that would be the

3    case -- I don't know.

4        Q    But that's what --

5        A    That's what that says.

6        Q    And that's in the highlighted area

7    that you said you were relying on, right?

8        A    Yep.

9        Q    And you do know that -- and you've

10   known all long that you had an amendatory

11   endorsement, or an endorsement that excluded

12   coverage for your heart or your circulatory

13   system?

14       A    For two years.

15       Q    I understand that that's what you

16   thought.

17       A    That's what I took it as.

18       Q    But that's not what that document

19   says, is it?

20       A    Well, when you go back, and you go

21   over the whole thing, one document says

22   you're not covered, but the other one says

23   -- gives a time frame.

WILLIAM MEADOWS

1    all right for two years, and then we'd --
2    we'll have the coverage, which we -- we was
3    over two years.
4        Q    Okay.  I'm talking over your head.
5    And I'm going to try to wait.  Now, you did
6    receive this letter -- the May 9, 2002,
7    letter, right?
8        A    I really don't know.  But I'm
9    guessing it probably come in with part of
10   the doings.  So, yes.  I don't -- I don't --
11   like I say, I don't read everything.
12       Q    And it says:  Depending on the
13   condition, the exclusion may be reconsidered
14   in one year.  We will need your written
15   request for consideration or removal, along
16   with such medical evidence, as may be
17   available at the time, which relates to the
18   excluded conditions, correct?
19       A    Right.
20       Q    It doesn't say anything in there
21   about in two years it's going to be gone,
22   does it?
23       A    No, but this does.  And that's what

WILLIAM MEADOWS

1    I refer back to every time.  That's what I

2    go back to.  That was the highlighted area

3    that -- that caught my attention.  And that

4    was what I was under the impression that was

5    going to happen.

6        Q    Okay.  Do you remember anything else

7    that Mr. Milford told you that you've not

8    already told me?

9        A    No.

10       Q    Okay.  Since -- you think that you

11   talked to Mr. -- you saw Mr. Milford on two

12   occasions.  Since that point in time, have

13   you had any other conversations with him?

14       A    No.

15           BY MR. LAMPKIN:  Okay.  There was

16   something about a tape that -- are you going

17   to make a copy of this for me?

18           BY MR. BRADSHAW:  Uh-huh.  (Counsel

19   indicates affirmatively.)

20           BY MR. LAMPKIN:  We'll identify that

21   as Exhibit 5 to the deposition.  So you just

22   get a copy made, and supply it to the court

23   reporter.  We'll make that Exhibit 5.

WILLIAM MEADOWS

1   me what it is that you say that Mr. Milford

2   told you that is not true.

3       A    The only thing, the coverage that I

4   was to understand -- you know, that I

5   understood that I would have after two

6   years.

7       Q    Okay.  Can you recall, specifically,

8   what he told you about that?

9       A    No.  But I can read -- I can go back

10  to the paperwork that's highlighted.  And

11  that's what I go by.  That's what I went by

12  was the highlighted area, that told me that

13  after two years I would be covered.

14       And that's what I've been -- that's

15  what I believed going into it.  And that's

16  what I believed all the way to the -- I was

17  told that I wasn't covered.

18      Q    But as to any specific statements

19  that Mr. Milford made, you cannot sit here

20  and tell me any specific statements that he

21  made --

22      A    No.

23      Q    -- on March 12th, 2002?

WILLIAM MEADOWS

1      A    No.

2      Q    And that's been, like you said,

3    almost four years ago.  It gets kind of hard

4    to remember something back that far, doesn't

5    it?

6      A    Especially whenever you're not a

7    hundred percent into it.

8      Q    Okay.  So whenever you got there,

9    you had other things on your mind.  You were

10   just kind of listening; is that right?

11     A    Well, similar.

12     Q    So you were not paying as much

13   attention as you are here today?

14     A    Probably not.

15     Q    You're sitting there.  He was

16   talking to you.  Your wife was there.  And

17   you were kind of half-listening; is that

18   right?

19     A    Well, you might say that.

20     Q    Would be that be a fair

21   characterization?

22     A    Well, I try -- I tried to pay

23   attention.  But, you know, I wouldn't -- I

WILLIAM MEADOWS

1   wouldn't say I was spaced out on cloud nine

2   somewhere.

3       Q    I understand that.  And then over

4   time, four years later, it makes it even

5   harder to remember?

6       A    Yeah.

7       Q    And as to anything specifically that

8   he told you, you just do not have any

9   recollection?  What you're relying on is

10  what's in the policy and what was

11  highlighted; is that correct?

12      A    That -- that's what got my attention

13  was the highlight.  That's what made me

14  decide to go ahead with the policy.

15      Q    Did Mr. Milford have the policy

16  there on that day, whenever he --

17      A    I --

18      Q    -- he was talking to you?

19      A    I don't know.  It's paperworks.  And

20  I don't know what's what on paperworks.  But

21  that right there let me know that I wouldn't

22  be covered for two years.  And I knew that I

23  wouldn't be covered for two years.  And

WILLIAM MEADOWS

1    remember, did he come to your house on one,

2    or two, or more occasions?

3        A    I can't remember whether it was one

4    or two.

5        Q    Okay.  All right.  This application,

6    which is attached to your policy, is

7    Defendants' Exhibit 3.  I'm going to walk

8    around here.  This is a little bit smaller

9    print than what we looked at earlier.

10       But Mr. Lampkin brought your attention

11   to C, up under declarations and agreement.

12   And he read it and asked you if that's

13   what's printed on here.  And it says:  The

14   agent does not have authority on behalf of

15   the company to accept the risk or to make,

16   alter, or amend a coverage, or to extend the

17   time for making any payments due such

18   coverage.

19       Now that I've sat here and read that to

20   you, do you understand what that means to

21   you?

22       A    I understand what that says, yeah.

23       Q    Okay.  What does it mean to you?

WILLIAM MEADOWS

1    A    Well, from what that says, the agent

2  himself cannot write a rider waiver --

3  whatever you want to call it.

4    Q    Okay.

5    A    It's got to come through -- I guess

6  through the company.

7    Q    Okay.  So he can't write the policy

8  while he's out there at your house; the

9  policy comes from the company?

10      BY MR. LAMPKIN:  Object to the form

11  of the question.

12    Q    (BY MR. BRADSHAW:)  Is that what you

13  understand?

14      BY MR. LAMPKIN:  Object to the form

15  of the question.  That's recharacterizing

16  what the man just said.  His testimony

17  speaks for itself.

18      (BY MR. BRADSHAW:)  Is that what you

19  understand?

20    A    Well, according to what I read here,

21  he can't write the policy, no.

22    Q    Did Mr. Milford -- while he was

23  there, on any other copy of the application,

WILLIAM MEADOWS

REEXAMINATION

BY MR. LAMPKIN:

    Q   Mr. Milford, you had the policy with the endorsement, the letter -- the May 9 letter, and all that since 2002; have you not?

    A   I guess we have.

    Q   And you just told us -- you understood that that endorsement was kind of like something on car insurance that excludes something from coverage, right?

    A   Right.

    Q   Okay.

    A   And I also said, if you go back to the highlighted area, and it says for two years.

    Q   Yes, sir.  I understand that you want to go back to the highlighted area. But the highlighted also says:  Not excluded by name and specific description; does it not?

    A   Well, I don't know about the name

WILLIAM MEADOWS

1   and description and all.  All I know is,

2   that it said it wouldn't cover -- I wouldn't

3   be covered for two years.

4        Q    So whatever that highlighted section

5   says is what you were relying on?

6        A    The highlight area told me that

7   after two years I'd -- the way I understood

8   it, that after two years I would be covered.

9        Q    That's the way you understood it?

10       A    That's the way I understand it.

11

12                    REEXAMINATION

13

14  BY MR. BRADFORD:

15       Q    Is that the way that Michael

16  Milford, the agent from Mega, represented it

17  to you?

18       A    That's the way I understood it.

19       Q    Is that the way he represented it to

20  you on that day?

21            BY MR. LAMPKIN:  Ask and answered.

22  He said that's the way he understood it.

23            THE WITNESS:  He told me that after