JEANIE MEADOWS

1    IN THE UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3              SOUTHERN DIVISION    ORIGINAL

4

5    CIVIL ACTION NO.: 1:05-CV-1091-MBF-VPM

6

7    WILLIAM MEADOWS and JEANIE MEADOWS,

8              Plaintiffs,

9         vs.

10   THE MEGA LIFE and HEALTH INSURANCE

     COMPANY, and its agent, MICHAEL JOSHUA

11   MILFORD, et al.,

12              Defendants.

13

14         S T I P U L A T I O N S

15

16         IT IS STIPULATED AND AGREED by and

17   between the parties, through their

18   respective counsel, that the videotaped

19   deposition of JEANIE MEADOWS, may be taken

20   before FRANCY HUGULEY HOPSON, Commissioner,

21   at the Law Office of Dwain Hartwick, 105 E.

22   College Street, Enterprise, Alabama, on the

23   17th day of February, 2006.

                              **Exhibit B**

JEANIE MEADOWS

1     Q   Childers.  And does she still reside
2  in this area?
3     A   Yes, sir.
4     Q   And that being Elba?
5     A   No.  She's in Enterprise.
6     Q   Enterprise?
7     A   Uh-huh.  (Witness indicates
8  affirmatively.)
9     Q   Does Christopher and Christine have
10  any children?
11     A   One.
12     Q   How old is that child?
13     A   She's six years old.
14     Q   Are you -- how far did you go in
15  school?
16     A   The seventh grade.
17     Q   Seventh grade?
18     A   Uh-huh.  (Witness indicates
19  affirmatively.)
20     Q   Can you read and write?
21     A   Yes, sir.
22     Q   Have you ever obtained your GED?
23     A   No, sir.

JEANIE MEADOWS

1     Q   Are you still seeing Dr. Fernandez?

2     A   I haven't seen him in about three

3 years now.

4     Q   So sometime up until 2003.  Does

5 that sound about right -- 2002?

6     A   I think the last time I seen him was

7 probably 1999.  I think that's the last time

8 I seen him, I think.

9     Q   Okay.  Were you prescribed any

10 medications for your --

11     A   Well, I was prescribed medications.

12 But I don't take any more of it now.

13     Q   Okay.  What medications were

14 prescribed?

15     A   Elmiron was one of them.

16     Q   Elmiron?

17     A   Uh-huh.  (Witness indicates

18 affirmatively.)

19     Q   Okay.  Tell me how you came to

20 purchase the Mega policy.

21     A   Well, I seen it advertised on TV.

22 And I seen some brochures on different

23 things -- going down the road, I think, or

JEANIE MEADOWS

1    something like that.  And I called about it.

2        Q    What -- did you call an

3    eight-hundred number?

4        A    Yes, sir, I called an eight-hundred

5    number.

6        Q    Did you get that in a brochure, or

7    was it something off the TV, or what?

8        A    I think -- I took it off the TV, I

9    think.

10       Q    When you called the eight-hundred

11   number, did you talk to a person or --

12       A    I talked to a person.

13       Q    What did they tell you?  Can you

14   recall that conversation?

15       A    He told me that he represented Mega

16   Life doings, and that he would be interested

17   in coming out and talking to us about the

18   insurance.  And --

19       Q    Did he -- I'm sorry.  Go ahead.

20       A    And he set up a time to come out and

21   see us.  I told him I'd have to let him know

22   because of the way my husband worked.

23       Q    When you called the eight-hundred

JEANIE MEADOWS

1    number, did you get that person?

2        A    I got that -- I got that person.

3        Q    Do you remember who that person was?

4        A    Michael.

5        Q    So when you called the eight-number,

6    you spoke directly to Michael Milford?

7        A    Uh-huh.  (Witness indicates

8    affirmatively.)

9        Q    Were you transferred or --

10        A    No, sir.  I spoke directly to him.

11        Q    Okay.  So he told you -- he said

12    that he'd come out.  At this time, did he

13    tell you anything about the coverage?

14        A    No.  He said that we'd just wait.

15    And he'd bring the stuff, and we'd talk

16    about it when he got there.

17        Q    Did you set up an appointment?

18        A    Yes, sir.

19        Q    Now, when he arrived -- can you

20    describe Mr. Milford and tell me what he

21    looked like?

22        A    He probably was an average-height

23    person.  I don't know exactly how tall he

JEANIE MEADOWS

1  front.  The Bates label should be 5 -- I've

2  got it here somewhere.  I believe it should

3  be 512 to 578 -- since it's mislabeled.  Do

4  you recall him showing you a brochure like

5  that?

6      A    Something similar to that, I think.

7  But I can't remember exactly for sure how it

8  looked.  But I remember -- a flag and stuff

9  like that, I remember that.

10     Q    And I'm going to show you what's

11  Bates labeled as ME0004813511 and ask you:

12  Do you recall Mr. Milford -- this was also

13  identified in your husband's deposition.  It

14  says Alabama Health Choice Benefit Plan.  Do

15  recall Mr. Milford showing you a document

16  that looked like that?

17     A    Yes, sir.  Like that, yes.

18     Q    And in particular, if you start

19  looking at it -- let's just kind of flip

20  through it right quick.  Move it over there.

21  You said you remember him going over the

22  deductibles, and things like that, of the

23  plan?

JEANIE MEADOWS

1    A    Yeah.  He showed me the deductibles.

2  And then he started asking me about:  Do we

3  have any health problems, and stuff like

4  that?  And I started telling him about

5  Vernon's problem, and I told him about my

6  problem.

7       And then we went from there talking

8  about -- he said, Now, they might want to go

9  a waiting period on y'all's condition.  And

10 I told him, I said, Well -- I said, Now, if

11 it's not going to cover us, I said, I don't

12 want to have nothing to do with it.  I said,

13 But -- I said, I'm going to listen to what

14 you've got to say.

15    Q    Okay.

16    A    And that's -- you know, that's where

17 that went to right there.  And then we

18 started talking about the policy -- about

19 what it would pay and what it wouldn't pay.

20    Q    Okay.  Do you recall him kind of

21 going through this --

22    A    Uh-huh.  (Witness indicates

23 affirmatively.)

JEANIE MEADOWS

```
1        A    Yes, sir.
2        Q    Do you understand that that's saying
3    -- you understand what an exclusion is,
4    don't you -- what that means?
5        A    Well, it means that, you know,
6    you're not covered for so many years, or how
7    many -- the time limit they put on it.
8        Q    And you understand what the word
9    limitation means, right?
10       A    Yes, sir.
11       Q    Then we go down to pre-existing
12   condition.  It says pre-existing conditions,
13   as defined, unless losses incurred at least
14   one year after the insured person's
15   effective date of coverage.
16       Pre-existing condition means a medical
17   condition, sickness, or injury, not excluded
18   by name or specific description, for which,
19   one, medical advice, consultation, or
20   treatment, was recommended by or received
21   from a physician within the one-year period
22   before the effective date of coverage; or,
23   two, symptoms existed which would cause an
```

**JEANIE MEADOWS**

1   ordinarily prudent person to seek diagnosis,

2   care, or treatment, within the one-year

3   period before the effective date of

4   coverage.  Is that what that says?

5       A    That's what it says there.

6       Q    Okay.  Do you understand what that

7   means?

8       A    Yes, sir.

9       Q    That means if you have a

10  pre-existing condition that's not excluded

11  by name or specific description, it's not

12  going to be covered for a year; is that

13  right?

14      A    That's what it says.

15      Q    And you can read and understand

16  that, can't you?

17      A    Yeah.  I can understand that.

18      Q    And you could have read and

19  understand that on March 12, 2002, right?

20      A    Well, I understood what it said.

21  But it's like when Michael went back and

22  circled that -- when he come back and --

23  because I --

JEANIE MEADOWS

1     Q    I'm going to get to that in a
2  minute.
3     A    Okay.
4     Q    I'm going to get to the circling and
5  all that.  But you can read and understand
6  that document?
7     A    Yes, sir.
8     Q    And if you'd have read and
9  understood that document on March 12th,
10 2002, you would have known that if it's a
11 pre-existing condition that's not excluded
12 by name or specific description, it will not
13 be covered for a year -- according to what
14 that document says, right?
15    A    According to what that document says
16 right there, yes.
17    Q    And you have no problem reading and
18 understanding that?
19    A    No, sir.
20    Q    Okay.  Now -- so you and Michael
21 Milford are sitting around the dining room
22 table.  And he's telling you -- and he
23 brings up -- I think you said that you may

JEANIE MEADOWS

1    not -- that you may have a waiting period?

2        A    Yeah.  He said we may have a waiting

3    period because we've got health conditions.

4        Q    Okay.  So you knew that, because of

5    these health conditions, there may be

6    something associated with that, in relation

7    to this policy, correct?

8        A    Yes, sir.

9        Q    Did he say anything other than there

10   may be a waiting period?

11       A    That's -- that's all he said was --

12   if we -- if -- there would be a waiting

13   period on the policy, on our conditions.

14   But since we haven't had any trouble -- back

15   since '95 -- that they probably would go

16   ahead and cover us within two years.

17       Q    Okay.  That's what he told you?

18       A    That's what he told us.  Told --

19   told me, to begin with.

20       Q    Do you remember anything else that

21   he said in regard to this waiting period, or

22   being covered within two years?

23       A    Not -- I can't think of anything

JEANIE MEADOWS

1  there, he came -- y'all all sat at the

2  kitchen table?

3      A    Yes, sir.

4      Q    You heard how he described it --

5  that Mr. Milford was kind of in between the

6  two of you -- the middle of the table?

7      A    Uh-huh.  (Witness indicates

8  affirmatively.)

9      Q    At that time, did Mr. Milford have

10  the insurance policy?

11      A    Not the insurance policy.

12      Q    Which is Exhibit 3.  He didn't have

13  that, did he?

14      A    He didn't have the insurance policy.

15  He just filled out the forms on the back of

16  it.

17      Q    Okay.  Which is the application?

18      A    The application.

19      Q    And did he leave documents with you

20  there that day when he left?

21      A    No.

22      Q    Okay.  Do recall there being -- what

23  the discussions were after your husband

JEANIE MEADOWS

1  been on the medication for his cholesterol,

2  and stuff like that, he hasn't had no

3  trouble, as far as his health -- heart

4  condition.  And --

5      Q    Did -- I'm sorry.  Go ahead.

6      A    And he said he didn't feel like

7  there'd be any problem writing the policy,

8  but there'd probably be about a two-year

9  waiting period on the policy, you know, as

10  far as his health condition and mine.

11     Q    Did Mr. Milford tell you that would

12  be a decision the company would have to

13  make?

14     A    No.  He didn't say that.

15     Q    Well, you understood that this was

16  going to be submitted, and then the policy

17  would be issued?

18     A    Yes, sir.  That's what I understood.

19     Q    Mr. Milford was not making that

20  decision there today.  He was taking an

21  application, setting up the necessary

22  payment.  I think you may have gotten a

23  check from your son.  And then you

JEANIE MEADOWS

1   understood that that would be submitted to

2   the company, correct?

3       A    Yes, sir.

4       Q    And you understood the company would

5   make a decision, and then decide whether to

6   issue the policy or not issue the policy?

7       A    He said he'd take -- he'd take the

8   stuff to the company, that the policy should

9   be issued without no problem.  That's what

10  he told me.

11      Q    Okay.  So do you recall anything

12  else that Mr. Milford told you on that day,

13  March 12, 2002, that we haven't talked

14  about?

15      A    He just kept on telling me that as

16  far as he knew that we'd be covered in --

17  with -- on our conditions within two years.

18  Because that was our main concern at that

19  point.

20      Q    Your main concern was having

21  coverage --

22      A    Yeah.

23      Q    -- at some point in time for your

JEANIE MEADOWS

1     A     Yes, sir.

2     Q     Did you do that?

3     A     I read it.

4     Q     You read the letter?

5     A     I read the letter.

6     Q     And did you read your policy?

7     A     I read the policy when he come

8  there.  And me and him went through it.  And

9  that's when he said, You see, even though

10  that -- he said, You're still covered after

11  two years -- after, you know, with your

12  pre-existing problems.  I said, Okay.

13      So I didn't -- after this come in, I

14  didn't pay no attention to it.  Because he

15  said it was in the policy -- like it was

16  supposed to be.

17     Q     But it says in bold there:  Based on

18  medical information received, it was

19  necessary for us to attach an exclusionary

20  endorsement to your coverage of insurance,

21  right?

22     A     That's what it says.

23     Q     Okay.  Depending on the conditions,

JEANIE MEADOWS

1   the exclusions may be reconsidered in one

2   year.  We will need your written request for

3   consideration of removal, along with such

4   medical evidence, as may be available at the

5   time which relates to the excluded

6   condition.  Do you see that?

7       A   Yes, sir.

8       Q   And you read this back in May of

9   2002, right?

10      A   Yes, sir.

11      Q   Did you take nay -- undertake any

12  efforts to request reconsideration of the

13  exclusion of your husband's heart and

14  circulatory conditions and your urinary

15  conditions?

16      A   No, sir, I did not.

17      Q   Okay.  So come May of 2003, you

18  didn't go back to the company and say, We

19  want this reconsidered.  Will you please

20  consider taking this off?

21      A   No sir.

22      Q   Well, let me ask you this.  You

23  understood that you were going to wait two

JEANIE MEADOWS

1    years.  But this says you could get that
2    renewed in a year --
3            BY MR. BRADSHAW:  Object to the
4    form.
5        Q    (BY MR. LAMPKIN:)  -- Does it not?
6            BY MR. LAMPKIN:  What's wrong with
7    the form of the question?
8            BY MR. BRADSHAW:  It doesn't say she
9    can get it removed in two years.  It says it
10   may be reconsidered.  That still leaves the
11   control and authority of maybe --
12           BY MR. LAMPKIN:  Could get it
13   removed.  I didn't say will be removed.
14       Q    (BY MR. LAMPKIN:)  Let me rephrase
15   the question.  You understood that you had a
16   -- based on what you're telling me, that it
17   was going to be two years?
18       A    Two years.
19       Q    This says you could ask that it be
20   removed in a year, right?
21       A    Yes, that's what it says.  But I
22   didn't think about it that way.  I just went
23   by what -- he said it probably still would

JEANIE MEADOWS

1    be two years before they would write it -- I

2    was covered.  So I didn't question it.  I

3    just let it be.

4        Q    You didn't do anything to try to

5    re-seek reconsideration?

6        A    Huh-uh.  (Witness indicates

7    negatively.)

8        Q    And, as I understand it, you said

9    your husband had not had any problems during

10   this time; is that right?

11       A    He hadn't had no trouble,

12   whatsoever.

13       Q    Okay.  And then after you received

14   this -- and you received the policy, right?

15       A    Yes, sir.

16       Q    Okay.  And you just don't remember

17   if these two were together?

18       A    I don't remember if them two was

19   together or not.  I can't remember.

20       Q    But you remember when you received

21   the policy in May of 2002, you went through

22   it --

23       A    Yes, sir.

JEANIE MEADOWS

1    Q    -- is that right?  Let's look at

2    this portion of that document, Exhibit 3,

3    that says, Henderson or HEND 96.  And this

4    is the endorsement to the policy that your

5    husband -- you were in here when I discussed

6    this with your husband.  You don't dispute

7    that that was contained in the policy when

8    you received it back in May of 2002, do you?

9    A    No, sir.

10   Q    And it says:  Attached endorsement.

11   Attached to and made a part of policy

12   certificate number, 052301047, which I think

13   is -- if we look over at one of the

14   declaration's page, we can see that's the

15   policy we're talking about -- the

16   certificate number?

17   A    Yes, sir.

18   Q    Did you read over this?

19   A    Yes, sir.  That's the reason that I

20   called Michael back, to find out for sure

21   about all of it.

22   Q    It says:  There is no coverage or

23   benefits provided for losses due to any

JEANIE MEADOWS

1    disease or disorder of the heart and/or

2    circulatory system on William V. Meadows; is

3    that right?

4        A    That's what it says.

5        Q    And it says:  There is no coverage

6    or benefits provided for losses due to any

7    disorder or diseases of the urinary system

8    on Jeanie L. Meadows, correct?

9        A    Yes, sir.

10        Q    And you knew that whenever you read

11    that, that this endorsement says:  He

12    doesn't have coverage for the heart and

13    circulatory system, and you don't have

14    coverage for the urinary system?

15        A    Yes, sir.

16        Q    And it says:  Anything in said

17    policy or certificate to the contrary,

18    notwithstanding.  This endorsement is

19    effective on the effective date of the

20    policy, slash, certificate, and shall expire

21    concurrently with said policy, slash,

22    certificate, unless otherwise terminated,

23    correct?

JEANIE MEADOWS

1    A    That's what it says.

2    Q    Okay.  And you said that at that

3    point you called Mr. Milford back?

4    A    Yes, sir.

5    Q    What happened when you called Mr.

6    Milford back?  What did you say to him?

7    A    I told him that I had some questions

8    to ask him about the policy, would he mind

9    meeting with me and going over the policy,

10   to be sure I was reading it right.

11   Q    When did he -- did he -- what did he

12   say in response to that?

13   A    He said that he'd come by.  And we

14   -- like I said, I don't remember when it was

15   when he come back by.  And we went over it.

16   And he showed me this.  Then he went back

17   over to page number eight.

18   Q    He showed you this, being the

19   endorsement --

20   A    Yeah, the endorsement about what it

21   said.  Then he come back over here, and he

22   said, But, you see, this is pre-existing

23   conditions.  And he says, It says -- it

JEANIE MEADOWS

1    still says two-year waiting period.

2        And I said, Well, if that's -- that's

3    the case, I said -- I said -- I said, Do you

4    mind circling it, to make sure that --

5    everything, to make sure that I know what

6    you're talking about?  And that's what he

7    did.

8        Q    So it's your testimony --

9        A    So I just didn't think nothing else

10   about it, you know.  He just told me that

11   we'd be covered.  And that's just the way I

12   assumed it would be.

13       Q    Let's look at that for just a

14   minute.  The circle -- it's your testimony

15   that Mr. Milford circled that in -- the pink

16   highlighting?

17       A    Yes, sir.

18       Q    And that says -- and this is page

19   eight of the policy.  It's under the

20   definitions.  Pre-existing condition means a

21   medical condition, sickness, or injury, not

22   excluded by name or specific description,

23   for which -- and then it goes through the

JEANIE MEADOWS

1 | other part of it, right?

2 |     A    Yes, sir.

3 |     Q    Okay.  And that not excluded by name

4 | or specific description is within what was

5 | circled; is it not?

6 |     A    Yes, sir.  All of it was circled all

7 | the way around it.

8 |     Q    And you agree with me that the

9 | endorsement specifically mentions by name

10 | the heart, and specific description the

11 | circulatory system, for your husband; does

12 | it not?

13 |     A    That's what it says on there.

14 |     Q    And it also by name or specific

15 | description, urinary system for you,

16 | correct?

17 |     A    Yeah.

18 |     Q    Okay.  So according to this

19 | definition, those are not included within

20 | the pre-existing condition, are they?

21 |     A    Well, according to this one, it's

22 | not.

23 |     Q    Okay.  And according to that

JEANIE MEADOWS

1    definition of pre-existing condition, a

2    pre-existing condition means a medical

3    condition, sickness, or injury, not excluded

4    by name or specific description; isn't that

5    correct?

6        A    That's what it says.

7        Q    And your condition and -- your

8    husband's condition of the heart and

9    circulatory system and your condition of the

10    urinary condition were specifically named or

11    by specific description in that endorsement,

12    correct?

13        A    That's what it says there.  But he

14    kept on saying it -- it still would be

15    covered in two years.

16        Q    Did he tell you that pre-existing

17    conditions would be covered in two years?

18        A    He said if we didn't have any

19    problems for two years -- from both mine and

20    his condition -- that it would pick it up

21    and cover it.

22        Q    Pick up what and cover it?

23        A    If Vernon had a heart condition, or

JEANIE MEADOWS

1    coverage, and we don't have it.

2        Q    Anything else?

3        A    That's about it.  It just -- you

4    know, the idea that he kept on telling us we

5    have coverage, and we don't have the

6    coverage.  You know, it just led me to

7    believe that within two years we would be

8    covered.

9        Q    And you know that, looking at

10   this --

11       A    After that, you know, looking at

12   it --

13       Q    You can see right there in the

14   policy, it says that those are not covered,

15   right?

16       A    Yes, sir.

17       Q    And you have the letter that says if

18   you want to get them covered, you can ask us

19   to cover them in a year, right?

20       A    Yes, sir.

21       Q    And you didn't do that, to try to

22   get them covered the following -- a year

23   later, did you?

JEANIE MEADOWS

1      A    No, sir, I didn't.

2      Q    Okay.  And you knew that -- you

3   would have known that just reading the

4   policy on your own, as to what the policy

5   itself says; would you not?

6      A    Well, I still would have probably

7   had a little bit of trouble understanding it

8   as much.  Because when you start reading the

9   whole policy doings, it -- you -- you flip

10  from one thing, and it goes back to another

11  thing.  And it goes to another thing.  And

12  you get questions.

13     Q    Yes, ma'am.  But you know that that

14  right there says for your husband, there is

15  no coverage?

16     A    Well, that's what -- that's what

17  caught my attention.  I read it.  And then I

18  got this.  And that's the reason I called

19  him back, to see what he would say about it.

20     Q    But you know that that's what that

21  says, right?

22     A    Yes, sir.

23     Q    And you know that on the application

JEANIE MEADOWS

1    it said -- you were here when your husband

2    -- -- that the agent has no ability to

3    change or modify this policy, does he?

4         A    Yeah.

5         Q    Do you agree with me?

6         A    Yes, sir.

7         Q    And you signed off underneath that

8    on the application, agreeing to all this?

9              BY MR. BRADSHAW:  What was the

10   question you just asked her?  She was here

11   when her husband answered that question, or

12   she knew that question?

13             BY MR. LAMPKIN:  Yes.  She was here

14   when her husband answered that question.

15        Q    (BY MR. LAMPKIN:)  And I think the

16   follow-up is:  You signed the application

17   right below your husband, where you agreed

18   that the agent had no authority to change or

19   modify this policy, correct?

20        A    Yes, sir.

21        Q    So you understand that when you

22   signed the application, right?

23        A    Yes, sir.

JEANIE MEADOWS

1    questions.  Thank you, Jeanie.

2         THE WITNESS:  Thank you.

3         BY MR. BRADSHAW:  James, do you have

4    anything else?

5         BY MR. LAMPKIN:  I'm thinking.

6

7                   REEXAMINATION

8

9    BY MR. LAMPKIN:

10        Q    Mrs. Meadows, you do not dispute

11   that you received that policy in May of

12   2002, correct?

13        A    Yes, sir.

14        Q    And you do not dispute that you

15   received that letter of May 9 in May of

16   2002, do you?

17        A    No, sir, I do not.

18        Q    And when you got those, you read

19   over both of them, correct?

20        A    Yes, sir.

21        BY MR. LAMPKIN:  That's all.

22

23